Whitney BARTIE

v.

UNITED STATES of America.

Civ. A. No. 7295.

United States District Court
W. D. Louisiana,
Lake Charles Division.

March 28, 1963.

H. Alva Brumfield, Baton Rouge, La., J. B. Jones, Jr., Cameron, La., for plaintiff.

Edward L. Shaheen, U. S. Atty., Q. L. Stewart, Asst. U. S. Atty., Shreveport, La., John G. Laughlin, Chief, Torts Sec-

tion, Dept. of Justice, M. M. Heuser, William A. Gershuny, Counsel, Dept. of Justice, Washington, D. C., for defendant.

HUNTER, District Judge.

Whitney Bartie and his family (wife and five children) went to bed around 10:00 P.M. on Wednesday, June 26th. He awoke around 5:00 A.M. hearing water underneath the house making a noise—slosh, slosh, slosh. He tried to start his car but it drowned out. He and his family joined hands, with the wind raging and the water rising. They climbed on the roof of the house and one by one they were washed away. The house disintegrated and as a deep freeze floated by he grabbed it and rode it for about four miles. As it passed a tree he grabbed onto a limb where he hung on until 4:30 P.M. on the afternoon of June 27th. This, the story of Whitney Bartie, is the story of hundreds of others who perished as Hurricane Audrey struck the Louisiana coast with devastating fury on the early morning of Thursday, June 27, 1957. Winds of over 100 miles per hour, driving rain, and a storm tide of over ten feet above mean sea level killed more than 400 persons and inflicted property damage in the hundreds of millions of dollars.

This action for wrongful death is brought by Whitney Bartie for the death of his wife and children. It is filed under the Federal Tort Claims Act. *It is one of several hundred wrongful death actions now pending as a result of this devastating catastrophe.*

Passing over the pleader's legal conclusions, the complaint asserts that the United States, "through its employees and agents, particularly those of the * * * Weather Bureau, was negligent in failing to give adequate, clear, correct, and proper warning concerning the nature, intensity, location, path, velocity and speed, existence of tidal wave of Hurricane Audrey as well as the correct time it would strike the Louisiana Coast" and that the plaintiff "relied upon the advisories and warnings issued by the * * * Weather Bureau and remained in their home; that in the early hours of the morning of June 27, 1957, contrary to such advisories and warnings, the hurricane struck in full force." Plaintiff's counsel also urges by brief that it was the intention of Bartie to leave Cameron Thursday and that he and his family did not previously leave when advised that persons in low lying areas should move to higher ground because they considered themselves to be on higher ground.

The government denies all allegations of negligence and pleads that the plaintiff himself was guilty of negligence proximately contributing to the death of his family by remaining in his home after he had received warning of impending peril. Moreover, the government has raised other interesting defenses: (1) That the statutory duty of the Weather Bureau to forecast the weather does not create a right-duty relationship between officers and employees of the Bureau and individuals as to afford the basis of a tort claim pegged on erroneous forecasts; (2) that the activities by reason of which plaintiff seeks to hold the United States liable fall within the discretionary function exception to the coverage of the Tort Claims Act as that provision has been interpreted by the Supreme Court of the United States in Dalehite v. United States, 1953, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427; (3) that the same activities fall within the "misrepresentation" exception to the coverage of the Tort Claims Act (28 U.S.C.A. § 2680 (h)).

## THE FACTS

On the basis of meteorological data and a radio report from a private shrimp boat, the Weather Bureau detected the beginning of Hurricane Audrey in the Bay of Compeche on Monday, June 24, 1957. The Weather Bureau bulletins and advisories on the hurricane are in evidence. They are marked as Exhibit A and made a part hereof. At 10:30 P.M. on Monday, June 24th the Weather

Bureau located the disturbance at about 300 miles southeast of Brownsville, Texas—which placed it in an area approximately due south of Cameron, Louisiana—and stated that "indications are for northward movement of the depression."

Now it was Tuesday, June 25th, and the second bulletin was issued at 4:00 A.M. on that date. It advised that the depression had remained nearly stationary during the night, but that there were "indications that it is beginning to intensify and a slow northward movement is expected later today." By 12:00 Noon the tropical disturbance had been classified a hurricane and was christened "Audrey." Advisory No. 2 at 4:00 P.M. reported Audrey northbound with highest winds at about 100 m. p. h. near the center, with gales extending outward 150 miles to the North and East. After stating that Audrey would drift northward and increase in size, the first of many express warnings were sounded about storm tides—"Tides are expected to rise and seas will become rough along the Texas and Louisiana coast tonight and Wednesday." At 6:00 P.M. on that day (June 25), the Bureau office at Lake Charles issued a "Special Bulletin." It advised:

"TIDES WILL BEGIN TO RISE TONIGHT ALONG THE COAST. THE PEOPLE IN LOW AND EXPOSED PLACES ALONG THE BEACH FROM THE WESTERN END OF VERMILLION BAY TO THE MOUTH OF THE SABINE SHOULD TAKE ACTION AND NOT BECOME STRANDED BY FLOODING OF ROADS ALONG THE BEACHES DUE TO HIGH TIDE."

Advisory No. 3 at 10:00 P.M. reported, "Audrey is increasing in size" and "moving slowly northward." Positions given in relation to previous advisories revealed that she was moving straight towards the Texas-Louisiana coastline. Her position then was due south of Lake Charles about 500 miles southwest of New Orleans. Once again appeared the express warning of tides: "Seas and tides will increase along the Louisiana and Texas coasts."

Came the dawn on Wednesday, June 26th. Things were getting no bettter fast. Advisory No. 4 was issued at 4:00 A.M. The "Hurricane Watch" described "the greatest threat to the Louisiana coast." It reported, "Audrey continues to increase in size * * * highest winds are estimated at 100 m. p. h. near the center and gales extend out 150 to 200 miles from center." Specific warning was again given of tidal action in the area of danger. Of critical importance, this was followed by something more specific: "tides are expected to be two or three feet above normal from the Mississippi Sound to the Upper Texas coast tonight and continue rising Thursday." Advisory No. 5 at 10:00 A.M. reported Audrey's position was further north but still on a beeline for Cameron Parish. The tidal situation was markedly worse, even in the few hours since the previous advisory at 4:00 A.M. It now warned, "tides are rising and will reach five to eight feet along the Louisiana coast and over the Mississippi Sound by late Thursday. This Advisory stated categorically, "Indications are for North * * * movement at 7 to 10 MPH with the Center reaching the Louisiana Coast late Thursday. However due to the size of the Hurricane gales will start along the Louisiana Coast tonight. All persons in low exposed places should move to higher ground." Things were no better, only·worse, at 4:00 P.M. when Advisory No. 6 continued the hurricane warning for the Louisiana Coast while describing all other areas from Galveston to Pensacola as "storm warnings only." Audrey was positioned about 300 miles south of Lake Charles with "indications * * * for continued northward movement at about 10 m. p. h." *The Center of the storm was predicted to reach the Western or Central Louisiana Coast late Thursday.* The tidal warning was again emphasized, "tides are rising * * *

*all persons in low exposed places should move to higher ground.*" At 7:00 P.M. a bulletin was issued, "Tides are now 2 to 3 feet along the upper Texas and Louisiana Coast * * *." At 10:00 P.M. another Advisory was released which reported the continuing northward movement of the storm at about 10 m. p. h. and repeated the information that high winds "extend out 150 to 200 miles" and that tides were "expected to reach 5 to 9 feet." Again and again, "like a haunting melody", was the same ominous warning: "All persons in low exposed places should move to higher ground." This time the warning was coupled with, "winds are increasing and will reach gale force tonight and early Thursday." There was a broadcast on both TV and Radio immediately after the regular 10:00 P.M. news on this night. During the broadcasts comments were made on the Hurricane which were intended for Lake Charles residents primarily but which were heard and viewed in the Cameron and coastal areas as well. *The Weather Bureau did not control this broadcast.* The broadcast contained such expressions as "there is no need for alarm tonight," and "you can rest well tonight." Unfortunately, all of the *recordings of the TV and radio recordings* of the transcript had been destroyed prior to July 6, 1957 and there was no competent evidence of precisely what was said (Exh. P–27). The text of this broadcast, as furnished in a letter from Mrs. Eleanor Shirley, was ruled inadmissible when plaintiff's counsel objected; but the broadcast was a matter of common knowledge and was referred to by practically all of plaintiff's witnesses.

Bartie apparently heard and was impressed by a broadcast at about 10:00 P.M. (Tr. 476). He was packed to leave but was waiting for someone to come around and say "we want all of you to move out of here."

The tragic day was here; the tragic hour was approaching. At 1:00 A.M. on Thursday, June 27th, a Special Bulletin was issued: "Hurricane Audrey has increased its speed and is moving northward about 15 MPH * * * It is expected to reach the coast near the Texas-Louisiana line with winds up to 100 MPH in the Lake Charles and Port Arthur area before Noon today * * * Winds and tides are rising along the upper Texas and Louisiana coasts * * tides 5–9 feet are expected."

Advisory No. 8 was issued at 4:00 A.M. We need not detail this, as well as the succeeding bulletins, because they are not involved in plaintiff's claims of misapprehension and negligence. However, as a matter of interest, the zero hour for Audrey's striking the coast was moved ahead from late Thursday (the 10:00 P.M. forecast of Wednesday, June 26th) to "before noon today (1:00 A.M. Thursday)." Likewise, the height of the storm tides was increased from 5 to 8 feet at 7:00 P.M. on Wednesday, to "5 to 9 feet" at 10:00 P.M. Wednesday and 1:00 A.M. Thursday. A bulletin at 7:00 A.M. reported correctly that the Hurricane moved inland near the Texas-Louisiana border and at 10:00 A.M. the center was about midway between Beaumont and Lake Charles. The center, or eye, of the hurricane was approximately 14 miles in diameter and the time of this landfall was estimated to have been at 9:00 A.M. on June 27th. The diameter of the storm itself was between 300 and 400 miles.

"Audrey" was in most particulars a typical tropical disturbance. The great havoc it reeked is explained in part by the topography of the region affected and the fact that the strongest or right sector winds continually approached and struck the coastline at approximately right angles. The coastline in Southwest Louisiana consists of narrow ridges frequently no more than 100 feet across and sometimes no more than three feet above mean sea level. North of this ridge the land drops to approximately sea level or below. In many locations the first continuous 5-foot contour is 15 to 20 miles inland from the coast. Several other

ridges with elevations varying from two to eight feet are found more or less parallel to the coast.[1]

The reporting of the inception, location and direction of the hurricane was promptly and accurately done. Its direction was frequently announced and predictions as to its forward course were made with accuracy, although the post-analysis of the locations of its actual "track" shows turning movements that might have misled even experienced forecasters. No claim has been made that the Weather Bureau Advisories and Warnings afforded any basis for doubt that the violent storm would strike land along the very area of its actual impact. On the question of *when*, it is not nearly so clear. *Indeed, the prediction of Wednesday (4:00 P.M.) that the "center" would hit "late Thursday" was wrong, and it was not until the 1:00 A.M. bulletin on Thursday, June 27th, that this was changed to "before noon today."*

The Weather Bureau's forecasts, insofar as they reflected a prediction of forward speed of the center of the hurricane, were expressed in such terms as "it is expected" or "indications are for * * * the center reaching Western or Central Louisiana coast late Thursday." The unpredicted speedup of the hurricane along its projected course unfortunately occurred during the night hours of June 26–27 when the airplane "fixes" of the center had to be made solely by radar and without the benefit of observation by the flight crews.

As disclosed by the depositions of Messrs. Lichtblau, Conner, and Craft of the New Orleans Forecast Center, the deposition of personnel from the Lake Charles Station, the deposition of Dr.

LaSeur, documentary evidence, and pertinent statutes and regulations, the promulgation of hurricane information and forecast by the Weather Bureau is accomplished as a result of complex and changeable arrangements and the use of expert subjective judgment covering many factors. The forecasting of the course, speed and other aspects of hurricanes was not in 1957, and is not now, an exact science. Here, the Navy, through its Airborne Early Warning Squadron Four, stationed at Jacksonville, Florida, undertook to obtain and furnish the critical information on Hurricane Audrey by numerous hazardous flights into the hurricane area commencing on June 25, 1957.[2] Upon a background knowledge of the historic climatology and meteorological phenomena of the area, continual evaluation of the obtained data was made. These evaluations involved the exercise of judgment and discretion.

The Weather Bureau does not own, control or operate television, radio or newspapers. All of its advisories, warnings and forecasts are publicized by delivery to privately owned and operated news media. Under delegation of authority within the Department of Commerce, the Weather Bureau Station at New Orleans is a forecast center with the responsibility for issuing hurricane warnings for the Gulf of Mexico. The Weather Bureau Airport Station at Lake Charles is responsible for area distribution to public dissemination channels for ten parishes in Southwestern Louisiana including Cameron and Calcasieu.

No experts testified to any negligence. The only expert evidence in the record is the testimony of Dr. Noel Edwin LaSeur, respecting the quality of the professional

---

1. Plaintiff lived on one of these ridges. He could see the Gulf from the front porch of his house. Between his house and the Gulf there was nothing but the road and the marsh.

2. It is interesting to note that the flight which departed from Corpus Christi Naval Station at 11:18 A.M., CST, on

June 26th, did not penetrate the storm. They made one radar fix before their radar failed and had to abort the mission. This fix was made at 1:49 P.M. on the 26th and the next such plane fix was a night time radar flight which provided eight different radar fixes over the period from 8:30 P.M. on the 26th to 1:00 A.M. on the 27th).

activities of Messrs. Lichtblau, Conner and Craft, the Weather Bureau's hurricane forecasters at New Orleans whose conduct is attacked as having constituted negligence. Dr. LaSeur is a Professor of Meteorology at Florida State University and serves as an Associate Director of the National Hurricane Research Project. He is not an employee of the United States in any sense. He is widely recognized as an expert in the field of Meteorology with special emphasis on hurricane knowledge. We accept his testimony. He stated:

"Meteorological prediction is in general less accurate than prediction in any of the physical sciences. This is due to two reasons primarily. One, we have an incomplete knowledge and understanding of the physical laws which govern the atmosphere at present; and secondly, we suffer from lack of data and information on which to make predictions based on these physical principles. This is particularly true over most of the tropical oceans and continental regions because of the scarcity of weather information that is typically available from these areas."

Dr. LaSeur further told us that a statistical summary of hurricane forecasts made for a period of five years prior to 1957 gives an average 24-hour error in the prediction of the position of the storm of between 100 and 120 miles. What that means is that if we predict today where a storm is going to be tomorrow at this time, we will, on the average, be 100 to 125 miles off.

Dr. LaSeur, without equivocation, gave this opinion:

"On the basis of experience in 1957 in following the course of the storm plus the review which has been carried out by myself recently, it would be my opinion that the Weather Bureau forecasters in the New Orleans hurricane forecast office made forecasts of the future positions and other characteristics of Hurricane Audrey which were commensurate with the state of hurricane forecasting at that time which were well within the probable errors of such forecasts at that time, or for that matter, at the present time. In spite of certain conflicting information, they were able to exercise good judgment and make forecasts which were as accurate as could be expected at that time.

We accept this testimony and adopt Dr. LaSeur's opinion as a finding of fact.

After listening to the plaintiff's witnesses, the Court is convinced that while the advisories themselves were technically more than adequate (although failing to anticipate the northward acceleration before the storm reached the coast) that the advices in the form received by the coastal people failed to convey the urgency of emergency action. The people realized that there was an approaching danger, but many concluded that with the storm (as late as 4:00 P.M. Wednesday) forecast to move inland late Thursday, that was no urgency to leave their homes until early Thursday. The court was impressed particularly with the testimony of Dr. Cecil W. Clark and Sheriff O. B. Carter. Dr. Cecil W. Clark, a fearless and forthright citizen who suffered heartbreaking personal losses during the storm (and whose personal heroism has endeared him forever to the people of Cameron) put it this way:

"I think that the radio and television—well, the radio especially, had a tendency to—well, just smooth it over, in other words, to make it more mild than what it actually was. They didn't want to apparently alarm the people and they apparently, in talking about it, they did stress that there was no need—no immediate danger at present. I can remember that on a lot of them. That's the way it was, "no immediate danger present." * * * And in Port Arthur, the same thing, and in other areas where you hear there

is no immediate danger, and so they assumed it was their area. The thing that was lacking was, it seems like at the time, that Cameron Parish was really just forgotten, neglected, and if when they were saying that—I never did hear one time, one word ever mentioned with the name of Cameron in any newscast or anything. Now, I listened to nearly everyone I could listen to and none of them ever predicted or gave anything specifically or even mentioned what the people should do."

THE COURT: "In Cameron Parish?"

DR. CLARK: "In Cameron Parish."

Sheriff O. B. Carter, a popular official and exemplary citizen whose personal leadership during the darkest hours of the catastrophe, saved many lives, had this to say:

*Question by Mr. Heuser:* "Well, this special bulletin that the Lake Charles Weather Bureau put out on Tuesday evening spoke of the possible flooding of roads, didn't it, that might trap the people?"

*Answer by Sheriff Carter*: "We had been getting those things for years about flooding of the roads and what-not, you understand, and up until the time that we are so advised that the storm is coming in near, we watch these waters; now, I will tell you, at 12:00 o'clock the night of the storm, which caught Cameron at 4:00 o'clock, the tide wasn't very high, it wasn't even acting up bad."

\*　　\*　　\*　　\*　　\*　　\*

Further questions and answers by Mr. Heuser and Sheriff Carter:

Q "Sheriff, I believe you told us that on the night of June 26th at about 10:00 o'clock, you heard a radio broadcast concerning the hurricane and the danger, is that correct, sir?"

A "No, that is not correct, I said about 10:15 was the last—I mean,

we got a news—a weathercast over the television."

Q "Over the television. Well, did you, about that time, also hear a radio broadcast from one of the stations in Lake Charles, if you remember?"

A. "Over the television, the Lake Charles television station, yes."

Q "Who was talking or making the statements that you recall?"

A "I think it was a man by the name of Von Lewin, who was the newscaster and give the weather and so forth."

Q "Do you recall which station that was?"

A "That was KPLC, I am sure, it's the only station we have on the VHF, I think."

Q "Well, do you remember whether or not this broadcast or the one about that time was said to be an advisory from the mayor and Central Emergency Committee in Lake Charles?"

A "I didn't get anything of that broadcast."

Q "You don't remember that?"

A "It's not that I don't remember, I did not get that part of where the mayor, aldermen or anybody else was concerned, he gave the weathercast and said, 'You can rest well tonight, get a good night's sleep because the storm will not reach the shores, the land, before late tomorrow afternoon,' something to that effect."

Q "That's what this Mr. Lewin, I believe you testified, said?"

A "Well, something, his name was something like that, I don't see him on the—hear anymore on the station."

\*　　\*　　\*　　\*　　\*　　\*

Q "Now, did this water rise rapidly, Sheriff, when it came in there?"

A. "Yes, it rose rapidly, it rose rapidly; I know that I was just hoping that it didn't rise too much before daybreak where we would have to probably swim or where we could see to better defend ourselves, to protect ourselves."

Q "And were there high waves on the water?"

A "Yes, sir, there were waves, high waves; it dashed over my house, the waves were coming over, there must have been, oh, I don't know, ten or twelve foot waves, maybe more than that, they were going over the house."

Eyewitness stories of the rise of high water along the Cameron Coast stress the suddenness with which the water burst upon the communities. It was in truth a tidal wave, all along these coastal areas from Cameron to Pecan Island, substantial farm houses were washed from their foundations and some were swept inland as much as 12 to 15 miles. In the Cameron area large school busses and many automobiles were swept from their parking places as much as a mile or more back into the marshes. The combination of wind force and the battering action of the sea as it swept inland produced strange patterns of destruction. At Lake Charles (30–35 miles to the north) hurricane winds prevailed for more than six hours and the principal damage was to roof structures, poorly constructed buildings, and public utility lines.

The Court will consider plaintiff's proffer of evidence relating to the precautions and warnings issued by the Weather Bureau during Hurricane Carla. The predictions as to time and place were not in my opinion as accurate as were those in "Audrey". At 10:00 A.M. on September 9th the Center was predicted to move inland on the Upper Texas or Extreme Western Louisiana Coast Sunday (10th). It finally moved inland on the afternoon of September 11th and its location then was over Fort Lavaca, Texas. Carla, before it hit, the coast, came almost to a "standstill" (see Bulletins of 6:00 A.M. and 8:00 A.M. on Sept. 10)—Audrey "increased its forward speed just before hitting (see Bulletin issued 1:00 A.M. June 27, 1957). But there is no question that more emphatic language was used concerning the evacuation. Then, too, descriptive and explanatory language was used concerning the "eye" or "center."

We all now understand a lot more than we did before those fatal hours of June 27, 1957. Emphatic language must be used concerning the urgency of evacuation. The advisories should inform the people in words of the advisory itself, that the full impact of the storm is felt hours before the center arrives. Then, too, there is needed a critical review of existing methods for local dissemination of hurricane advices by radio and television with emphasis upon broader responsibility for the local office and more effective communication between the local office and television-radio stations serving the area. We know now that when people in Cameron hear that there is "no danger tonight," they naturally think that the announcer is talking about Cameron. We know now that people along the coast of Louisiana, when they hear the warning, "all persons in low exposed areas should move to higher ground" that they understand "low exposed areas" to mean the marshes and "high ground" to be that near the seashore but on a 5–8 foot ridge. Surely, in the future Hurricane Warnings will be more explicit. In Carla the references were made to "low coastal areas along the Louisiana * * * and Texas Coast," rather than to low exposed areas in relation to higher grounds.

To say that Whitney Bartie would have done this or that, had the advisories and warnings been worded more explicitly, is pure speculation. He did not read any of the warnings and heard only one. He was waiting for someone to say "we want you all to move out of here." No such duty was imposed on the Weather Bureau by statute or regulation.

## THE LAW

█ The question of the liability of the United States for negligence depends on the scope and meaning of the Federal Tort Claims Act. The history of the adoption of that Act and the reasons therefor have been thoroughly reviewed by the Supreme Court of the United States.[3]

The relevant provisions of the Federal Tort Claims Act are 28 U.S.C.A. §§ 1346 (b), 2674, 2680(a) and 2680(h):

*Sec. 1346(b):* "* * * the district courts * * * shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

*Sec. 2674:* "The United States shall be liable * * * in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."

*Sec. 2680:* "The provisions of this chapter and section 1346(b) of this title shall not apply to—

"(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

*Sec. 2680(h):* "Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."

█ The Tort Claims Act was designed to render the United States liable for its torts in the same manner and to the same extent as would be a private individual under like circumstances (Rayonier, Inc. v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354). The substantive rights of the parties must be measured by the law of the state in which the cause of action arose. In this instance, it is Louisiana. Concededly, the substantive law of Louisiana is that a defendant's negligence, in order to justify recovery by plaintiff, must be established by a preponderance of the evidence. In the instant case plaintiff has failed to affirmatively establish the requisite negligence on the part of the Weather Bureau. It necessarily follows that recovery should be denied. This is only the first of several hundred death cases growing out of "Audrey." Another record might reveal negligence and/or proximate cause. We proceed to discuss the defenses asserted by the government, which if any were to be sustained would constitute a complete legal defense.

## ARE THE ACTS UPON WHICH THE COMPLAINT IS BASED WITHIN THE EXCEPTION TO SOVEREIGN IMMUNITY FOR TORT CLAIMS?

█ The provision in this exclusion (Title 28 Sec. 2680(a), supra) that the government is not liable for torts based upon the exercise or performance, or the failure to exercise or perform, a discretionary function or duty, has been the subject of much debate in the federal courts. There is, we think, a rather nebulous area of liability in the so-called

---

3. Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152; Dalehite v.

United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427.

"operational level" of even a "discretionary function." To me, the distinction for negligent or wrongful acts at the "operational level" has not been drawn with any degree of clarity. Prior to the opinion of the Supreme Court in Dalehite v. U. S., 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427, the district courts had held in a number of cases that the exception applied to cases involving the flooding of lands resulting from government negligence. Thomas v. United States, D.C.Mo., 81 F.Supp. 881; Boyce v. United States, D.C.Iowa, 93 F.Supp. 866; Olson v. United States, D.C.N.Dak., 93 F.Supp. 150; North v. United States., D.C.Utah, 94 F.Supp. 824; Mid-Central Fish Company v. United States, D.C. W.D.Mo., 112 F.Supp. 792; Western Mercantile Company v. United States, D.C., 111 F.Supp. 799. In Mid-Central Fish, supra, it was specifically stated:

"Even assuming that plaintiff might be brought within the ambit of that Act, and establish a duty owing to it, still plaintiff could not premise a tort claim thereon against the Government for apparently the duties thereby imposed on the Army Engineers and the Weather Bureau are 'discretionary duties' falling within the exceptions to the Federal Tort Claims Act as set forth in section 2680 (a), Title 28 U.S.C.A."

Dalehite was an action to recover damages for a death resulting from a catastrophic explosion, in Texas City, Texas, of ammonium nitrate fertilizer produced at the instance and according to specifications and under the control of the United States. After reviewing the legislative history and purposes of the Tort Claims Act, and in discussing the discretionary exemption, the following test was enumerated:

"It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. *Where there is room for policy judgment and decision there is discretion.*" (Emphasis ours).

Dalehite was a 5–4 decision and it may be that the later decisions of the Supreme Court in Indian Towing Company v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48, and Rayonier, Inc. v. United States, 352 U.S. 315, 77 S. Ct. 374, 1 L.Ed. 354; United States v. Union Trust Co., 350 U.S. 907, 765 S.Ct. 192, 100 L.Ed. 799, have enlarged on the construction of Dalehite. Judge Cameron, speaking for the Fifth Circuit, in Fair v. United States, 234 F.2d 288, suggests "that the minority in Dalehite, whose dissent was indicative of the desire to give broad extension to the Tort Claims Act, had become the majority in Indian Towing Co." However, my reading of the opinions and the dissents in these two cases leaves me with the impression that the test hereinabove noted from Dalehite, is still the test to be used in determining the issue of a discretionary function.

Clearly, the acts here complained of relating to the content and the wording of the bulletins and advisories, were determinations made by administrators involving policy, judgment and discretion. The purpose of the statutes creating the Weather Bureau and expending its activities reveal an awareness on the part of Congress that it has inaugurated a program of public service that is unparalleled by any private enterprise or activity and one which requires peculiar skills and specialized training in a still developing field of learning. Subjective judgment is necessarily employed in the decisions that are made. Means and methods of obtaining observational data require continual exercise of judgment and discretion. The means and manner of communicating with the public—not spelled out in any statute—also involve the exercise of judgment and discretion. (See Clark v. United States, D.C., 109 F.

Supp. 213, aff. on other grounds, 9 Cir., 218 F.2d 446; National Manufacturing Co. v. United States, 8 Cir., 210 F.2d 263, cert. denied 347 U.S. 967, 74 S.Ct. 778, 98 L.Ed. 1108).

The situation here is not comparable to such cases as Indian Towing Company v. United States, supra, relating to negligence in failing to maintain a Coast Guard lighthouse properly, or Rayonier, Inc. v. United States, supra, negligence of an employee of the United States in allowing a fire to start on government land and in failing to exercise due care to put it out. The so-called "rescue" cases are not applicable. A forecast is necessarily made at once and is not a first step in an active endeavor of "rescue." It is aimed at unknown thousands or millions who might or might not be in the path of peril, and not to particular individuals.

The activities by reason of which plaintiff seeks to hold the United States liable fall within the discretionary function exception to the coverage as that provision has been interpreted by the United States Supreme Court in Dalehite, supra, and by the Eighth Circuit in National Manufacturing, supra.

IS THE CLAIM HERE ONE "ARISING OUT OF * * * MISREPRESENTATION," WITHIN THE 2680(h) EXCEPTION?

 The Government, apparently feeling secure with its other defenses, has not briefed this claimed exception.

The leading case has been the Second Circuit's decision in Jones v. United States, 207 F.2d 563, which involved a statement issued to plaintiffs by the U. S. Geological Survey, erroneously estimating the oil producing capacity of certain land. In reliance upon that statement, plaintiffs sold securities representing oil and gas rights in the land for less than their actual value, and later sought to recoup their loss from the government under a complaint alleging negligent misrepresentation. The Court categorically stated that 2680(h) applied to both "mis-

representation" and "deceit," and further emphasized that "misrepresentation meant negligent misrepresentation," and that the exception was an absolute defense. Following this interpretation came the Eighth Circuit's National Manufacturing Company, et al. v. United States, 210 F.2d 263. There, plaintiff complained that certain government employees (presumably the Weather Bureau) "carelessly and negligently disseminated misinformation respecting the course and action of the flood waters;" that "as a direct result of negligent assurances" the plaintiffs " 'were misinformed'; and that the [government] employees negligently and carelessly assured the plaintiffs that the river would not overflow." The Court squarely declared that the alleged negligent dissemination of misinformation constituted a misrepresentation within the meaning of Section 2680(h) and dismissed the case against the government. The next recorded case was Clark v. United States, 9th Cir., 218 F.2d 446. There, suit was brought under the Federal Tort Claims Act for damages to personal property when a river broke through an embankment and flooded a city. The Court held that 2680(h) included negligent, as well as intentional, representations, and held that there could be no recovery for misrepresentation with respect to the safety of the embankment. To the same effect are Miller Harness Co. v. United States, 241 F.2d 781, 2nd Cir.; and Hall v. United States, 274 F.2d 69, 10th Cir. These cases were all reviewed and approved by the Supreme Court of the United States in United States v. Neustadt, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614. This language from Neustadt is pertinent:

"Throughout this line of decisions, the argument has been made by plaintiffs, and consistently rejected by the courts, until this case, that the bar of § 2680(h) does not apply when the gist of the claim lies in *negligence* underlying the inaccurate representation, i. e., when the claim is phrased as one 'arising out of' negligence rather than 'misrepresenta-

tion.' But this argument, as was forcefully demonstrated by the Tenth Circuit in Hall v. United States, supra, is nothing more than an attempt to circumvent § 2680(h) by denying that it applies to negligent misrepresentation. In the Hall case, it was alleged that agents of the Department of Agriculture had negligently inspected the plaintiff's cattle and, as a result, mistakenly reported that the cattle were diseased. Relying upon that report, plaintiff sold the cattle, at less than their fair value, and sought recovery from the Government of his loss on the ground that it had been caused by the negligent inspection underlying the agents' report, rather than by the report itself. The Tenth Circuit rejected the claim, stating:

" 'We must then look beyond the literal meaning of the language to ascertain the real cause of complaint * * * Plaintiff's loss came about when the Government agents misrepresented the condition of the cattle, telling him they were diseased when, in fact, they were free from disease * * * This stated a cause of action predicated on a misrepresentation. Misrepresentation as used in the exclusionary provision [of § 2680 (h)] was meant to include negligent misrepresentation.' 274 F.2d, at 71."

The jurisprudence is uniform that a complaint pegged on negligent misrepresentation does not state a cause of action under the Federal Tort Claims Act.

■ We hold that the activities by reason of which plaintiff seeks to find the United States liable is a claim "arising out of * * * misrepresentation" within the meaning of the exclusion set forth in 28 U.S.C.A. 2680(h), and hence, is not actionable under the Tort Claims Act, and for that reason, too, there should be judgment for the Government.[4] It follows from the foregoing that plaintiff has no enforcible claim against the United States under the Federal Tort Claims Act. This makes it unnecessary to consider the further reason urged by the Government for the dismissal of the complaint, to-wit, that neither in Louisiana nor elsewhere may one be held liable in tort for an erroneous prediction or the dissemination of public information, not of a personal character.

This opinion shall constitute the findings of fact and conclusions of law by the Court. Counsel for defendant will prepare and present a judgment in accordance therewith. This decision will not become final until that judgment has been signed, entered, and notice thereof served on plaintiff's counsel.

4. On the merits, findings of fact and conclusions have been set forth which pre-

clude recovery, those findings and conclusions are set forth in the alternative.