**Elbert B. SCHINMANN and Teddie Schinmann, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**H.F. ALLEN ORCHARDS, INC., et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Nos. C–82–064JLQ, C–82–093JLQ.

United States District Court, E.D. Washington.

Sept. 18, 1985.

Bryan G. Evenson, Yakima, Wash., Burton J. Goldstein, San Francisco, Cal., for plaintiffs.

Robert Sweeney, Asst. U.S. Atty., Spokane, Wash., for defendant.

### ORDER GRANTING GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

QUACKENBUSH, District Judge.

BEFORE THE COURT is the government's Motion for Summary Judgment (Ct.

Rec. 21),[1] which came on for hearing with oral argument as scheduled September 9, 1985. Plaintiffs were represented by Bryan G. Evenson and Burton J. Goldstein; Assistant United States Attorney Robert M. Sweeney appeared on behalf of the government.

## FACTUAL BACKGROUND

This is a case brought under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, by about 159 farmers and irrigation system users in the Yakima Valley of South Central Washington for miscalculation by the Bureau of Reclamation of their irrigation water supply for 1977. The suit seeks recovery for losses arising from the irrigation users' alteration of farm operations in reliance upon the Bureau's 1977 water supply forecast.

Plaintiffs in these actions are members of irrigation districts in the Yakima River Valley who receive irrigation water under contracts between the districts and the United States, through the Bureau of Reclamation's Yakima Project. The facilities of the Yakima Project, which include six (6) storage reservoirs and related dams, canals and pumping plants, are used to supply water in monthly allocations to irrigation districts, which then convey the water in their own canals for distribution to member farmers and ranchers. The water is supplied subject to the water rights of the various districts established in a Consent Decree entered on January 31, 1945, in *Kittitas Reclamation District v. Sunnyside Valley Irrigation District* (Eastern District of Washington, Southern Division, Civil Action No. 21) (Appendix Document 1, Ct.Rec. 22).

The Consent Decree established, among other things, the obligation of the United States to distribute irrigation water according to a defined formula in a period of insufficient supply. For purposes of distributing water in a "dry" year, the irrigation districts were classified as either "non-

proratables" holding senior water rights or "proratables" holding junior rights. In a year of short supply, the rights of non-proratables were to be fully satisfied from the available supply before the proratables received any water. Two of the larger districts within the Yakima Project, the Kittitas Reclamation District and the Roza Irrigation District, held water rights that were one hundred percent proratable. The Wapato Irrigation Project held rights that were fifty percent proratable and fifty percent non-proratable. Most of the rights of the Sunnyside Valley and Yakima-Tieton Irrigation Districts were non-proratable rights. Of the approximately 13,000 individual water users in the Yakima Project, about one-half were supplied with non-proratable water and the rest received water subject to proration during periods of shortage. The 159 plaintiffs herein are members of districts having proratable water rights (Ct. Rec. 35, pp. 7–8).

Paragraph 18 of the Consent Decree provided a method for calculating the amount of irrigation water available in any given year, which figure was known as the "total water supply available" (TWSA).

> For purposes of this judgment "total water supply available" is defined as that amount of water available in any year from natural flow of the Yakima River, and its tributaries, from storage in the various Government reservoirs on the Yakima watershed and from other sources, to supply the contract obligations of the United States to deliver water and to supply claimed rights to the use of the water on the Yakima River, and its tributaries, heretofore recognized by the United States.

Thus, there are three components in the calculation of TWSA: water from the natural flow of the Yakima River and its tributaries; from storage in government reservoirs; and from "other sources," which refer primarily to "return flow," *i.e.,* the amount returning to the river system after

---

**1.** All references herein to the record will use the court record numbers of the *Allen Orchards* case [C–82–093] rather than those of the consol-

idated *Schinmann* case. All pleadings relevant to this motion are identical in the two cases.

being diverted for irrigation purposes. Miscalculation of the latter component, return flow, was central in the events leading to this litigation.

Drought conditions in the Yakima River basin in the fall of 1976 and early 1977 caused the Bureau of Reclamation to invoke, for the first time in 32 years, the provisions of the Consent Decree regarding allocation of water between proratable and non-proratable users. In order to do so, the Bureau made a TWSA calculation which was announced on February 7, 1977 (the government has alleged that the Consent Decree did not specify that the Bureau was to make and communicate such calculation, but that Bureau employees determined it was logical and necessary to do so). This first forecast, which Bureau hydrologists allege they couched in a "worst possible scenario" context, projected a total water supply for the 1977 irrigation season of 1,220,000 acre feet. With the non-proratable water rights to be supplied first, proratable water users were told that they would receive, under the forecast, only seven percent (7%) of their normal water supply (Ct.Rec. 34, p. 13).

On March 18, 1977, the Roza Irrigation District filed a motion in United States District Court, Eastern District of Washington, asking the court to reopen the 1945 Consent Decree, enjoin the Bureau from allocating water from the Yakima Project in accordance with the Bureau's interpretation of the Decree, and order a "more just and equitable" distribution of the water. The motion was denied on April 26, 1977 (Ct.Rec. 25, pp. 10–11).

Meanwhile, on April 7, 1977, the Bureau revised its TWSA figure to approximately 1,490,000 acre feet, which had the effect of increasing the proratable supply from about seven percent (7%) to thirteen percent (13%). The ostensible reason for the increased estimate was improved precipitation (Ct.Rec. 25, p. 11) but deposition testimony indicated that the increase was effected when the Bureau's Yakima and Boise offices, in a bureaucratic dispute about the proper projected TWSA, "split the difference" between the projections of the two offices (Ct.Rec. 34, pp. 18–19).

In April and May, Bureau hydrologists discovered more water in the Yakima River system than estimated and recalculated the TWSA, for the first time adding return flow as a distinct element. Proratable users were now to receive fifty percent of their normal supply. The Bureau maintains that it previously could not have added return flow separately because of a lack of data about actual diversions being made and reports of water actually returning to the river system after diversion (Ct.Rec. 25, pp. 11–12). Plaintiffs, on the other hand, contend that the Bureau's failure from the outset to isolate return flow from its runoff figures, and to include return flow as a "double entry" was negligent; "the source of the error was not insufficiency of empirical data, but the Bureau's conceptual misunderstanding ..." (Ct.Rec. 34, p. 21). An affidavit by plaintiffs' expert, John A. Dracup, explains that

... return flow is water which originates as natural flow or precipitation which has been diverted once for irrigation, but which has returned to the river system for a second or third, etc., subsequent downstream diversion and is thus reused possibly numerous times. Therefore, in an irrigation water supply computation, return flow must be separately added as a "double entry" or in effect as an artificial tributary to the river system.

(Ct.Rec. 33, p. 8). Mr. Dracup stated his belief that "the Bureau of Reclamation employees failed to act as reasonable and prudent hydrologists and water managers" in failing to separately add return flow to pre-May 1977 computations and in assuming that runoff measurements included return flow (*Id.*).

In June, a fourth TWSA was issued, this one increasing the estimated supply available to proratable water users to seventy percent (70%); by year's end, according to plaintiffs, the proratable districts got about eighty-three percent (83%) of the water to which they were entitled, adequate to meet one hundred percent (100%) of prior actual

historical use (Ct.Rec. 34, p. 23). The government says the Bureau delivered 2,070,000 acre feet of water through the Yakima Project for the entire 1977 irrigation season (Ct.Rec. 25, p. 12). Of the increase over the initial estimate—850,000 acre feet—the government says 350,000 resulted from return flows and the other 500,000 from favorable precipitation, lower ambient temperatures reducing the demand for water, less-than-usual water diversions, and increased efficiency by the irrigation districts and water users in conveying and applying their water (Ct.Rec. 25, pp. 12–13). However, plaintiffs question the government's figures and contend that precipitation could not account for the "tremendous upward adjustment of the TWSA upon discovery of the return flow omissions" (Ct.Rec. 25, p. 8).

Following the 1977 irrigation season, plaintiffs filed administrative claims with the Bureau of Reclamation as required by 28 U.S.C. § 2675(a). After the claims were denied by the Solicitor of the Department of the Interior, these actions were filed. While the original *Schinmann* complaint included allegations that the government had failed to enlarge its water storage facilities "equivalent to [its] contractual commitment to deliver irrigation water," that claim appears to have been discarded in favor of the claim of a negligently-forecast water supply.

Plaintiffs previously filed a Tucker Act action based upon similar facts in the United States Court of Claims but proceeded to file this action "to preserve plaintiffs' remedies" (Ct.Rec. 1). The Court of Claims action was dismissed on the government's motion for summary judgment, and dismissal was affirmed by the Ninth Circuit Court of Appeals which agreed that the Consent Decree did not expressly obligate the Bureau to inform farmers of available water in a time of shortage. *H.F. Allen Orchards v. United States*, 749 F.2d 1571 (9th Cir.1984). Most of the materials submitted by plaintiffs in opposition to the present summary judgment motion are discovery from the Court of Claims action.

## SUMMARY OF PARTIES' CONTENTIONS

The government has filed a motion for summary judgment for failure to state a claim upon which relief can be granted and lack of jurisdiction under the Federal Tort Claims Act. Specifically, the government alleges three bases on which it claims summary judgment is appropriate. It says the claim is barred (1) by the misrepresentation exception of 28 U.S.C. § 2680(h); (2) by the discretionary acts exception of 28 U.S.C. § 2680(a); and (3) by the exculpatory clauses of the contracts between the United States and the irrigation districts (Ct.Rec. 24). The government has submitted, in support of its motion, the affidavits of William Gray, former superintendent of the Yakima Project (Ct.Rec. 30), Onni Perala, chief of hydrology at the Yakima Project during the relevant period herein (Ct.Rec. 29) and Daniel Yribar, river operations coordinator at the Bureau's regional office in Boise (Ct.Rec. 28). These affidavits state, in general, that the Bureau operated the Yakima Project in compliance with the Consent Decree and the District Court's April, 1977 Order; that the Bureau's miscalculations were caused by a number of unknown variables and lack of empirical data; and that changes in the TWSA were necessitated by abnormal weather conditions and the difficulties inherent in interpreting, for the first time, the relevant Consent Decree provisions.

Plaintiffs respond, in essence, that neither statutory exception nor the exculpatory clauses apply to shield the government from suit under the present circumstances. They allege that the Bureau's miscalculations—"operational" rather than discretionary tasks—came not from lack of data, an ambiguous Consent Decree or abnormal weather conditions, but from "gross conceptual error" (Ct.Rec. 34, p. 15). Plaintiffs claim there was an existing, historically sound rule that the Bureau could have used to project return flow (Ct.Rec. 34, p. 20) but instead the government ignored return flow as the primary "other source"

of water which was required by the Consent Decree to be separately added in computing TWSA. Plaintiffs further allege that Yakima Project officials were led astray by the regional office in Boise, which tried to apply flood control principles to the problems of estimating irrigation water supply. They also cite depositions of Bureau employees in an attempt to establish that the employees knowingly engaged in "guesstimates," refusing to apply their own scientific evidence (Ct.Rec. 34, pp. 11–23).

Plaintiffs claim the primary disputed material facts include: (1) whether the Bureau hydrologists had sufficient information to make an initial return flow computation; (2) whether the subsequent increases in estimates of water supply were due to the negligence of the Bureau or to unseasonable rains and other unforeseeable variables; (3) whether the Consent Decree's formula was actually unique and difficult to apply; and, (4) whether the Bureau's hydrologists engaged in conceptual error which deviated from a required standard of care (Ct.Rec. 35).

In its Reply Memorandum, the government concedes that upon this motion the court should accept as true plaintiffs' allegations of negligence in the Bureau's calculation of the 1977 irrigation water supply (Ct.Rec. 38, p. 5). However, "even if the water supply forecast was negligently calculated, the plaintiffs' claims are still barred by the misrepresentation and discretionary function exceptions to the Federal Tort Claims Act" (the government has placed secondary emphasis on its exculpatory clause defense).

Summary judgment is appropriate where, viewing the evidence and the inferences arising therefrom in favor of the non-movant, there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P.; *Cardwell v. Kurtz*, 765 F.2d 776, 778 (9th Cir.1985). In the present case the court must assume, for the purposes of this motion, that the government acted negligently in its calcula-

tion of the 1977 water supply forecast. However, it must still be determined whether the misrepresentation and discretionary exceptions of 28 U.S.C. § 2680(h) and (a), respectively, apply entitling the government to judgment as a matter of law.

## THE MISREPRESENTATION EXCEPTION

The United States argues that the misrepresentation exception to federal liability under 28 U.S.C. § 2680(h) immunizes it from liability in this suit. Under the pertinent part of that section:

The provisions of this chapter and section 1346(b) of this title shall not apply to—

. . . . .

(h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit or interference with contract rights;

. . . . .

While plaintiffs claim the negligence of the Bureau was not in the issuance of the inaccurate forecast but in the negligent manner in which it was calculated, "[t]he government submits ... that the essential ingredient of plaintiffs' claim is the communication of inaccurate information upon which they relied to their economic detriment" (Ct.Rec. 24, p. 9). Because the Bureau ultimately delivered as much water as required, "[w]ithout the communication of the information, the plaintiffs would have no claim ..." (*Id.*).

The government relies upon two key cases in its misrepresentation defense: *United States v. Neustadt*, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961) and *Block v. Neal*, 460 U.S. 289, 103 S.Ct. 1089, 75 L.Ed.2d 67 (1983). In *Neustadt*, the high court held that the misrepresentation exception applied to shield the government from liability where home buyers had been furnished a statement reporting the results of an inaccurate FHA inspection and appraisal, and in reliance thereon paid a pur-

chase price in excess of the property's fair market value. *Neustadt* found that the misrepresentation exception encompassed negligent, as well as wilful, misrepresentations, 366 U.S. at 702, 81 S.Ct. at 1298, and disagreed with the Fourth Circuit's opinion that the misrepresentation was "merely incidental" to the "gravamen" of the claim, *i.e.*, "the careless making of an excessive appraisal." 366 U.S. at 704, 81 S.Ct. at 1299.

> To say, as the Fourth Circuit did, that a claim arises out of "negligence" rather than "misrepresentation," when the loss suffered by the injured party is caused by the breach of a "specific duty" owed by the Government to him, *i.e.*, the duty to use due care in obtaining and communicating information on which that party may reasonably be expected to rely in the conduct of his economic affairs, is only to state the traditional and commonly understood definition of the tort of "negligent misrepresentation," as is clearly, if not conclusively, shown by the authorities set forth in the margin [here the court refers to the Restatement of Torts, § 522].

366 U.S. at 706, 81 S.Ct. at 1300. *Neustadt* observed that misrepresentation, as opposed to other torts, has been confined largely to the invasion of economic interests. 366 U.S. at 711, n. 26, 81 S.Ct. at 1302 n. 26. The government alleges that "[t]he claims of the farmers and ranchers in these proceedings fit squarely within the concept of negligent misrepresentation" explained in the Restatement and *Neustadt*. (Ct.Rec. 24, p. 13).

Plaintiffs in the instant case assert that *Neustadt* has been modified by *Block v. Neal, supra* (Ct.Rec. 34, p. 31). This does not appear to be the case. In *Block v. Neal*, respondent had purchased a home built with a subsidized rural housing loan from the Farmers Home Administration (FmHA). The house had a number of defects discovered after respondent moved in, and she had sued the government under the Federal Tort Claims Act for negligent supervision and inspection of the house's construction. The court found that the suit was not barred by the misrepresentation exception because Mrs. Neal's action was based solely on negligent supervision and inspection, not on the statements of FmHA officials. The court distinguished *Neustadt*, observing that Neustadt had "alleged no injury that he would have suffered independently of his reliance on the erroneous appraisal." 460 U.S. at 296, 103 S.Ct. at 1093. *Block v. Neal* noted that:

> [S]ection 2680(h) thus relieves the Government of tort liability for pecuniary injuries which are wholly attributable to reliance on the Government's negligent misstatements. As a result, the statutory exception undoubtedly preserves sovereign immunity with respect to a broad range of Government actions. But it does not bar negligence actions which focus not on the Government's failure to use due care in communicating information, but rather on the Government's breach of a different duty.

460 U.S. at 297, 103 S.Ct. at 1093.

*Block v. Neal* thus indicates that a determining factor in the applicability of the misrepresentation exception is the gravamen of the claim. In the case at bar, the government asserts that the essential element of plaintiffs' claim is "the communication of inaccurate information and without this element the farmers and ranchers would have no claim at all" (Ct.Rec. 24, p. 17). The government cites *Guild v. United States*, 685 F.2d 324 (9th Cir.1982), as an illustration of the difference between the performance of operational tasks and the communication of information. In *Guild*, the government was sued after the failure of a dam for which the Soil Conservation Service had done extensive work, including the surveying of sites, preparation of a topographic survey, recommendation of a site and provision of construction plans and specifications.

> The key distinction in this area is between the performance of operational tasks and the communication of information. The Government is liable for injuries resulting from negligence in performance of operational tasks even

though misrepresentations are collaterally involved. It is not liable, however, for injuries resulting from commercial decisions made in reliance on government representations.

685 F.2d at 325 (citations omitted). Plaintiffs cite *Guild* to support their contention that this case may be brought on a theory of "hydrological malpractice" akin to the "species of engineering malpractice" in *Guild* (Ct.Rec. 33, p. 57). As in *Guild*, plaintiff are arguing that the complained-of conduct is not the communication of information but the performance of operational tasks, here the computation of water supply estimates. However, as the government asserts, in the present case there would have been no loss absent the communications to the farmers; this distinguishes the present case from *Guild*.

Plaintiffs cite a number of cases illustrating their "operational tasks" argument. The opinion which they assert is perhaps "the leading case," *United Airlines v. Wiener*, 335 F.2d 379 (9th Cir.1964) involved wrongful death actions arising out of the collision between a commercial airliner and an Air Force jet fighter. The court found that the misrepresentation exception did not bar suit against the government for alleged negligence including failure to adequately inform the commercial airliner of the government's hazardous fighter activity, but distinguished its case from *Neustadt*.

> Here, the gravamen of the action is not misrepresentation but the negligent performance of operational tasks, although such negligence consisted partly of a failure of a duty to warn.

335 F.2d at 398,

*Ingham v. Eastern Air Lines, Inc.*, 373 F.2d 227 (2nd Cir.1967), another case cited by plaintiffs, refused to apply section 2680(h) to immunize the government against charges of negligent failure to provide an airliner with notice of adverse changes in the weather. However, *Ingham*, which, like *Wiener*, dealt with personal injuries and death, distinguished itself from *Neustadt*, which "involved business dealings of a financial or commercial character with the government, a totally different setting from the instant action." 373 F.2d at 239.

Plaintiffs also cite as "another case closely in [sic] point", *Brown v. United States*, 599 F.Supp. 877 (Mass.1984), an admiralty case involving deaths resulting from reliance on an inaccurate weather forecast which was the consequence of the government's failure to repair a malfunctioning weather data buoy. Plaintiffs' claim, held the court, was not based on the inaccurate forecasts but on the cause of the inaccuracy: the government's negligent failure to perform the operational task it had assumed of maintaining the weather buoy. Thus the misrepresentation exception did not apply. However, *Brown* noted the language from *Block v. Neal, supra*, to the effect that § 2680(h) relieved the government of liability for *pecuniary* injuries attributable wholly to the misrepresentations of the government. 599 F.Supp. at 890 (emphasis added).

Plaintiffs also refer to *Ausland v. United States*, 488 F.Supp. 426 (S.D.1980). That case sets out a test to determine whether a claim is covered by the § 2680(h) exclusion for misrepresentation. The test

> ... is whether [the claim] is for personal injury or property damages arising from negligent performance of operational tasks ... [or] injury resulting from commercial decisions taken in reliance on governmental misrepresentations ... If the latter, a case is barred by § 2680(h).

488 F.Supp. at 431.

> The Ninth Circuit has similarly held
>
> ... that the misrepresentation exception precludes liability where the plaintiff suffers economic loss as a result of a commercial decision which was based on a misrepresentation by government consisting either of false statements or a failure to provide information which it had a duty to provide.
>
> ... Where the plaintiffs' injuries were not commercial, as for instance, in the airplane crash cases, and the medical services cases, courts have generally ruled

that the exception does not preclude claims based on the government's failure to inform. On the other hand, the exception has usually been held to bar claims for damages resulting from commercial decisions based on false or inadequate information.

*Green v. United States,* 629 F.2d 581 (9th Cir.1980) (citations omitted).

In the present case, plaintiffs argue that the "government's misrepresentations were not commercial," and that the misrepresentation exception should not apply (Ct. Rec. 34, p. 38). However, *Green, supra,* indicates that "the applicability of the exception depends upon the commercial setting within which the economic loss arose." 629 F.2d at 584. It clearly appears that the decisions of farmers and ranchers in the present case—changing crops, selling cattle, investing in wells and additional irrigation equipment—were commercial or economic, within the scope of § 2680(h). Moreover, in ascertaining the gravamen of the present action it appears clear that, absent the communication of misinformation to plaintiffs, no damage would have ensued. Plaintiffs' contention that "[t]he Bureau's communication is collateral" to the improper computation of the water supply is not well taken. The proximate cause of the loss to the farmers appears to have been the misrepresentation or communication of misinformation, not the erroneous calculation of figures.

### THE DISCRETIONARY FUNCTION EXCEPTION

■ The discretionary function exception of 28 U.S.C. Section 2680(a) states:

The provisions of this chapter and section 1346(b) of this title shall not apply to—

(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

The Government claims that this exception applies to the decision by Reclamation Bureau officials to issue a water supply forecast and to the content and wording of the forecast "for the reason that the Bureau of Reclamation was not obligated, contractually or statutorily, to provide the water users in the Valley with a forecast at all" (Ct.Rec. 24). In fact, although Bureau officials realized it was "logical, reasonable and appropriate" for the Bureau to formulate and issue the 1977 forecast, it was not obligated under the Consent Decree to do so (Ct.Rec. 24, pp. 23–24); *see* 749 F.2d 1571, *supra.*

Three cases provide primary guidance in determining whether the discretionary function exception should be applied in the present case. They are *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), *United States v. S.A. Empressa da Viaco, etc., (Varig Airlines),* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), and the very recent case of *Begay v. United States,* 768 F.2d 1059 (9th Cir.1985).

*Dalehite,* a case involving explosions of ammonium nitrate fertilizer produced at the instance and under the control and specifications of the United States, described the discretion protected by § 2680(a) as "the discretion of the executive or the administrator to act according to one's best judgment of the best course," 346 U.S. at 34, 73 S.Ct. at 967, and stated that the discretionary duty which is excluded from coverage under the Federal Tort Claims Act:

... includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable.

*Id.* at 36, 73 S.Ct. at 968. Plaintiffs cite *Dalehite* in an attempt to establish that the intent of Congress in creating the discretionary immunity exception was to immunize the government only where no negligence was present on the part of any government agent (Ct.Rec. 34, p. 43). However *Dalehite* noted that the second part of § 2680(a) excepting acts of discretion in the performance of government functions "whether or not the discretion involved be abused"

> ... connotes both negligence and wrongful acts in the exercise of the discretion because the Act itself covers only "negligent and wrongful act or omission of any employee," "within the scope of his office" "where the United States, if a private person, would be liable." 28 U.S.C. § 1346(b). The exercise of discretion could not be abused without negligence or a wrongful act. The Committee reports ... show this.

346 U.S. at 33, 73 S.Ct. at 966.

Plaintiffs also dispute that the government's conduct involved judgment of a political, economic or social policy nature sufficient to invoke the discretionary functions exception (Ct.Rec. 34, p. 44; *see Varig Airlines, supra*). However, it appears that the Bureau's decision to issue the forecast was an administrative decision "grounded in social [or] economic ... policy" for which Congress intended to prevent judicial "second guessing." 467 U.S. at ——, 104 S.Ct. at 2765.

It is also notable that a number of courts have held the discretionary function exception applicable to negligent weather forecasts and predictions of natural disasters. *See National Manufacturing Co. v. United States*, 210 F.2d 263 (8th Cir.1954) and *Bartie v. United States*, 216 F.Supp. 10 (W.D.La.1963).

Plaintiffs assert that even if the decisions to compute the water supply and announce it to the farmers were discretionary (which they do not concede), the United States is liable under the "good Samaritan" doctrine of *Indian Towing Co., Inc. v. United States*, 350 U.S. 61, 76 S.Ct. 122,

100 L.Ed. 48 (1955). In *Indian Towing*, plaintiffs alleged that their tugboat ran aground (with resulting damage to its cargo) because the Coast Guard had failed to inspect and repair a lighthouse. The Supreme Court, noting that the question was one of liability for negligence at the "operational level" of governmental activity, 350 U.S. at 64, 76 S.Ct. at 124, held that:

> The Coast Guard need not undertake its lighthouse service. But once it exercised its discretion to operate a light ... and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light to give warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Tort Claims Act.

350 U.S. at 69, 76 S.Ct. at 126. Plaintiffs in the present case cite numerous opinions, "progeny of the *Indian Towing* decision," where the government was held liable for the negligent performance of admittedly discretionary decisions (Ct.Rec. 33, pp. 47–48).

The *Varig Airlines* case, *supra*, discussed the "good samaritan" rule in light of § 2680(a). In *Varig* (as, by implication, in the present case) it was alleged that *Dalehite* had been eroded if not overruled by *Indian Towing* and like cases. However, the court observed in *Varig* that *Indian Towing* could be distinguished; there, "the Government *conceded* that the discretionary function exception was not implicated, ... arguing instead that the Act contained an implied exception from liability for 'uniquely governmental functions.'" 467 U.S. at ——, 104 S.Ct. at 2764. In *Varig*, where it was alleged that the United States was negligent in inspecting certain aircraft modifications, the Supreme Court reversed the Ninth Circuit decision allowing plaintiffs to recover under California's

"good samaritan" rule, and held that the discretionary function exception of the Federal Tort Claims Act barred the suit.

*Varig* set out several factors "useful in determining when the acts of a Government employee are protected from liability by § 2680(a)":

First, it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case ... [T]he basic inquiry ... is whether the challenged acts of a Government employee—whatever his rank—are of the nature and quality that Congress intended to shield from tort liability.

Second, whatever else the discretionary function exception may include, it plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals ... Congress wished to prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort. By fashioning an exception for discretionary government functions, including regulatory activities, Congress took "steps to protect the Government from liability that would seriously handicap efficient government operations."

467 U.S. at ——, 104 S.Ct. at 2765 (citation omitted).

*Begay, supra,* gave the Ninth Circuit its "first opportunity to apply *Varig* to a case not involving strictly 'regulatory' action of an agency." 768 F.2d at 1062. *Begay* involved Navajo Indians who sued the government under the Federal Tort Claims Act for personal injuries arising from alleged excessive exposure to radiation in uranium mines in Arizona. The Indians complained that various governmental agencies were negligent in failing to establish and enforce radiation safety standards, and that a study undertaken by the Public Health Service (PHS) was a "good samaritan" undertaking which had been negligently performed because the miners were not warned of radiation exposure and its hazards.

However, the court, reviewing the *Varig* factors, found that the decision not to disclose the possible dangers of uranium mining to the Indians "was based on [a] judgment of what the best course of action was under the existing circumstances." At 1064. It involved a policy decision—a decision to test for radiation exposure—which was "discretionary by its very nature." *Id.* at 1064. Despite the fact that "this is the type of case that cries out of redress, ... the courts are not able to give it; Congress is the appropriate source in this instance." *Id.* at 1065.[2]

In the present case, regardless of alleged negligence on the part of Bureau officials and undisputed losses, it nonetheless appears that the conduct of the Bureau falls within the discretionary functions exception of *Dalehite, Varig* and *Begay,* rather than within the "good samaritan" rule of *Indian Towing.*

### THE EXCULPATORY CLAUSES

Because summary judgment appears appropriate under the two statutory exceptions, it is not necessary to construe the exculpatory clauses in the contracts between the United States and the various irrigation districts.

Therefore, having reviewed the record, heard the oral argument of counsel and being fully advised in this matter, IT IS HEREBY ORDERED:

1. The government's Motion for Summary Judgment is GRANTED, for lack of jurisdiction under 28 U.S.C. § 2671 *et seq.,* and failure to state a claim on which relief can be granted, and the complaint and the claims therein in *Schinmann v. United States,* C-82-064-JLQ and *Allen Or-*

---

**2.** It should be noted that *Begay,* in a footnote, discarded the planning level/operational level dichotomy traditionally used in analyzing applicability of the discretionary function exception.

The court decided that "the proper approach to determining when the exception applies is for the court to look to the nature of the conduct in question." At 1062, n. 2.

*chards, et al. v. United States,* C–82–093–JLQ, are DISMISSED WITH PREJUDICE.

IT IS SO ORDERED. The Clerk is directed to enter this Order and forward copies to counsel.