Bernard **CHANON**, Administrator and Personal Representative of the Estates of William L. Carter and Marvin L. Hull

v.

**UNITED STATES** of America.

**Civ. A. No. 70–C–131.**

United States District Court,
S. D. Texas,
Corpus Christi Division.

Sept. 28, 1972.

Sidney Ravkind, Houston, Tex., for Chanon.

Alfred H. O. Boudreau, Jr., U. S. Dept. of Justice, B. Stephen Rice, Asst. U. S. Atty., Houston, Tex., for United States.

## MEMORANDUM AND ORDER

OWEN D. COX, District Judge.

This action is brought by Bernard Chanon, Administrator of the Estates of William L. Carter and of Marvin L. Hull, both of whom died when the F/V GULF WIND, a shrimping vessel, sank in the Gulf of Mexico in February, 1969. This Court has jurisdiction under Section 1346(b) of Title 28, U.S.C., and the alleged liability of the government is predicated on Section 2674 of the same title.

GULF WIND, a wooden vessel 51.5 feet in length, was in good condition. She departed Cameron, Louisiana, on February 12, 1969, with Carter, as Master of the vessel, and Hull aboard, to work her way back to Freeport, Texas. Late that evening, GULF WIND separated from her companion, the F/V WAGONER, and was, by 11:00 p. m. the following night, February 13, approximately thirty miles south of Galveston, Texas, in twelve fathoms of water. At that time, the Master of GULF WIND reported to the WAGONER that he was going to haul in his nets and go into Freeport because of the rough weather. The last contact with GULF WIND was about an hour later. GULF WIND did not reach Freeport. She was reported overdue on February 15 and a search on February 16 had negative results. Identifiable sections of the GULF WIND were later washed ashore. The body of Marvin L. Hull was brought ashore about ten days later. Carter's body was never found.

Apparently, this vessel, F/V GULF WIND, sank as a result of damage inflicted by a severe storm which passed along the Texas coast in the Galveston-Freeport area in the early morning of February 14, 1969. This sudden storm generated winds in excess of 80 miles

per hour and waves from 20 to 30 feet, and was characterized by the Coast Guard as a "fierce 'instant hurricane'." In addition to the tragic loss of the GULF WIND and her crew, a number of other vessels were damaged, some were lost, and several other seafarers drowned.

■ At the time of this disastrous blow, there were three Weather Service (formerly "Weather Bureau") offices primarily involved in gathering information, forecasting and reporting on the elements in the Freeport-Galveston-Port Arthur area. These were Weather Service offices at San Antonio (WSFO) and at Houston (WSO) and Galveston. Since the government, through the Weather Service, had been, for many years, forecasting the weather and issuing reports and warnings for the general public, including land-based operations as well as fishing vessels in the gulf, it was under the duty to use due care in gathering weather information, forecasting and making available for broadcasting, up-to-date weather information. Indian Towing Company v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). The forecasts, particularly in the general area above referred to, were prepared with information obtained from reliable sources, as to wave heights, tide data, wind velocity, and other significant conditions.

■ The methods used by the Weather Service (WSO Galveston having the responsibility here) in accumulating weather data appear to be completely reasonable under the circumstances. The government was not required to explore every possible avenue for finding out what was going on. It didn't have to place a recording device every one-half mile all over the Gulf of Mexico, nor did it have to meet the standard a private business for profit might fix for itself or have to establish in order to stay in business.

■ Weather predictions cannot be given the character of established facts. Even with today's techniques, the general public questions the reliability of the daily weather forecasts, not because of any doubt that reasonable methods are used in making such determinations, but because of the vagaries of the weather. So, a forecast that turns out to be an erroneous forecast, standing alone, should not be considered as any evidence of fault on the part of the Weather Service. To make a wrong judgment on the future weather in a segment of a large area, as apparently happened here, is not such an error as requires a reckoning.

■ The Plaintiffs rely on their expert as to the inaccuracy of the government's forecasts. The Court is satisfied he was a fair witness. But, the nature of his business, his contractual obligations with only certain companies, and the manner in which he was able to gather information from his customers, do not make him a witness adverse to the government. And, based upon facts reasonably available to the government, he did not voice any substantial disagreement with the government forecasts. His testimony, perhaps nudged by personal pride, is not contrary enough to refute the Court's opinion that the government acted reasonably in obtaining its information under the circumstances and in accordance with adequate procedures previously established. The Court finds the government was not negligent in the manner of assembling the pertinent weather facts nor in the method of formulating the forecasts and warnings as to the weather during the critical time in this case.

The forecasts and warnings having been properly prepared, the Weather Service necessarily, in order to make that information available for the public, had to send it out for further transmittal. This was done by teletypewriter on what is known as the National Oceanic and Atmospheric Administration (NOAA) Weather Wire Service, and then it is disseminated to the public primarily by the news media, that is, radio and television stations and the newspapers. Local radio stations which were

broadcasting weather reports on the basis of this wire service, before and during the storm, were KGBC in Galveston, KPRC, KTRH, KNZW and KODA in Houston, and KTLW in Texas City. KLC in the Galveston area broadcast weather information obtained by telephone calls to WSO Galveston. The Coast Guard also receives weather forecasts by teletype and it broadcast weather warnings during that period.

■ WSO Galveston, on VHF/FM radio station KHB40, provided a continuous weather information service for marine and public interests in the greater Galveston area. Shrimpboats do not ordinarily carry the special radio equipment needed to pick up that station. However, what KHB40 puts out is, ordinarily, picked up for rebroadcast by commercial radio stations in the area and is also available on the local cable TV system. So, since the government agencies have few facilities for its own broadcasts, the general public, including the shrimp fishermen, doesn't rely on the direct government broadcasts. Thus, the government owed no duty to the two deceased seamen to directly broadcast the weather information at any time. But, we think it did have a duty to use due care in forwarding weather forecasts and warnings to the commercial radio stations in the area.

The forecasts furnished by the government and available and which, by undisputed evidence, were broadcast over the commercial stations and could have been heard by the seamen on GULF WIND, were the three small-craft warnings released at 7:30 p. m. CST, February 13, the first two originating with San Antonio and the third with WSO Houston. At 9:30 p. m., small-craft warnings were again released, with an indication of stronger winds and higher waves. The 7:30 a. m. and 8:00 a. m. gale warnings, and the 11:00 a. m. tide statement of the 14th originated with WSO Galveston. The Court finds these weather forecast releases were reasonably accurate as of the time of release.

At this point, it becomes important to explain that Plaintiffs' principal contention is Carter and Hull, aboard the GULF WIND, although having several radios, allegedly relied primarily on weathercasts from station KQP. That station is a radio service operated by Southwestern Bell Telephone Company, which broadcasts, from Galveston, Texas, weather information at noon and midnight, and at fifteen minutes past the odd hour. The Coast Guard teletypes weather information relating to marine activity to that station. Additional weather information may be obtained by seafarers and others interested through direct radio contact with said Marine Operator. So, we believe the government had a duty to forward the available weather information to KQP. But, it had no duty to see to it that such private sources, such as the commercial broadcasting stations and KQP and other Marine Operators, did actually transmit the weather information provided.

Now it becomes pertinent to consider the apparent dispute as to whether a 10:10 p. m. San Antonio weather forecast, released for broadcast at 10:30 p. m., and earmarked for the Galveston Marine Operator, station KQP, ever reached that operator. That weather forecast continued to advertise small-craft warnings but predicted higher winds and waves than had been previously indicated. Plaintiffs' proof that such forecast did not go out on the air at all is inadequate. It was to be furnished to other weathercasters, as well as KQP, and may very well have been, for all we know. However, the evidence that it did not go out on KQP is stronger. But, would Carter or Hull, while pulling in their nets, have been listening, at fifteen minutes past the odd hour (11:15 p. m.) or at midnight, after the vessel was on its way to port? If not, it would have made no difference. The evidence of Plaintiffs' almost total reliance on the weathercasts from KQP has a touch of afterthought about it. The Plaintiffs failed in their burden to es-

tablish such reliance. The decision of Carter to pull in the nets and start for shore could have been based on the actual condition of the weather GULF WIND was experiencing at the time, or it could have been based on a radio broadcast. The timing would fit the reception of a radio transmission of the weather forecast originating in San Antonio at 10:10 p. m., for release at 10:30 p. m., or even an earlier broadcast. There is no evidence, one way or the other.

■ Nevertheless, even if there had been a mistake and the 10:10 p. m. San Antonio weather forecast ended up with government red tape in someone's wastebasket, this Court concludes the difference in the information contained in it was not sufficiently more frightening so as to make any difference to the experienced seafarers on the vessels, and particularly GULF WIND, in the Freeport-Galveston-Port Arthur area. There is no negligence in not repeating information already accurately given. Spaulding v. United States, 455 F.2d 222 (9th Cir. 1972), citing Somlo v. United States, 416 F.2d 640, 646 (7th Cir. 1969).

The Court does find, however, that all forecasts made and all warnings prepared by the Weather Service were sent out for general use by various commercial and private radio transmitting stations. If the said 10:10 p. m. weather forecast was not put on the air, broadcast or otherwise transmitted by the Galveston Marine Operator of Southwestern Bell Telephone Company, no inference of government fault results. The wastebasket may very well have been in the offices of that company.

There is little case law on the problem before this Court. The facts here do not fit the pattern of the airplane cases such as Hartz v. United States, 387 F.2d 870 (5th Cir. 1968), and Gill v. United States, 429 F.2d 1072 (5th Cir. 1970). In those cases, the weather conditions were obvious and those in the air-traffic control tower made careless mistakes in transmitting instructions. Nor is the unsuccessful rescue case of United States v. Gavagan, 280 F.2d 319 (5th Cir. 1960), applicable. There again, obviously mistaken information was given as to the existing physical facts.

■ Consequently, this Court concludes that Plaintiffs have failed to establish by a preponderance of the testimony and any substantial inferences that the government breached any duty to the deceased seamen; and, even so, regardless of whatever breach may have occurred, the evidence is entirely insufficient to prove that it was a proximate cause of the loss of the F/V GULF WIND and the lives of those two unfortunate men aboard. Although this was most certainly a very tragic happening, there was no liability for it on the part of the government, and the Plaintiffs, Bernard Chanon, Administrator of the Estate of William L. Carter and the Estate of Marvin L. Hull, are not entitled to recover anything from the United States.

The foregoing shall constitute the findings of fact and the conclusions of law of this Court. The Defendant shall, within twenty days from the date of this Memorandum and Order, present to the Court an appropriate final judgment based on the findings and conclusions above set out.

The Clerk shall furnish a copy of this Memorandum and Order to the appropriate parties.