Honour BROWN, Individually and as Personal Representative of Gary Brown and as Administratrix of the estate of Gary Brown, et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 81–168–T.

United States District Court, D. Massachusetts.

Dec. 21, 1984.

Michael B. Latti, William J. Griset, Jr., Latti Associates, Boston, Mass., for plaintiffs.

David Hutchinson, Trial Atty., Torts Branch, Civil Div., Washington, D.C., for defendant.

## OPINION

TAURO, District Judge.

On November 21, 1980, the fishing vessels SEA FEVER and FAIRWIND left the port of Hyannis, Massachusetts for the fishing grounds near Georges Bank. The next day, several crew members were lost during a vicious storm that hit Georges Bank. In this action, plaintiffs [1] contend

---

**1.** Plaintiffs are the personal representatives of the estates of three deceased fishermen (Gary Brown, William Garnos, David Berry) who lost their lives during the storm. Plaintiffs, Garnos and Berry have separate suits pending before Judge McNaught against the owner of the FAIRWIND, Fairwind, Inc. Sea Fever Corporation, a defendant/third party plaintiff, seeks indemnity and contribution from the government.

that the National Oceanic and Atmospheric Administration ("NOAA") negligently failed to maintain a weather observation buoy on Georges Bank whose data was critical to accurate forecasts and, as a result, deprived the vessels of essential navigational information that would have allowed them to escape the tragic consequences of the crippling storm.

In May 1984, a seven day bench trial was held, limited to the issue of liability. After the receipt of post-trial briefs, the matter was taken under advisement on October 26, 1984.

## I

### THE STORM

Shortly before noon on Friday, November 21, 1980, the lobster-fishing vessels FAIRWIND and SEA FEVER left Hyannis, Massachusetts and headed for their lobster traps located on the southeast slope of the Atlantic Ocean's Georges Bank. The FAIRWIND was a 52 foot, steel hull, diesel powered vessel built in 1973. Captain William Garnos was the ship's master. George Berry, Robert Thayer, and Ernest Hazard were crewmembers. The SEA FEVER, built in 1972, was 46½ foot, wood hull, and diesel powered. Captain Peter Brown was the ship's master. Brad Bowen, Richard Rowell, and Gary Brown were crewmembers. Both vessels were equipped with sophisticated nautical equipment, including VHF radios, radar, Loran position finders, depth sounders and single sideband radios. This equipment, coupled with information provided by the National Weather Service (NWS), made it possible for vessels their size to fish 100 miles off shore in that portion of the Continental shelf known as Georges Bank.

Captain Brown testified that it is industry custom for fishermen to use the VHF and sideband radios to monitor the forecasts of the NWS as well as the Notices to Mariners which provide navigational information and special weather warnings. Within fifty miles of shore, fishermen monitor the continuously broadcast VHF forecast. Beyond that range, they monitor the forecasts issued every six hours on the sideband radio. Two stations broadcast the forecasts—a six megacycle band from Portsmouth, Virginia and a two megacycle band, twenty minutes later, from Boston, Massachusetts. Customarily, the fishermen listen to the 5:00 a.m., 11:00 a.m., 5:00 p.m. and 11:00 p.m. NWS broadcasts out of Portsmouth, and the 5:20 a.m., 11:20 a.m., 5:20 p.m. and 11:20 p.m. broadcasts from Boston.

Captain Brown testified that buoy data from various locations at sea was among the information he heard transmitted directly from the NWS prior to November 1980. That buoy data included buoy location, wind speed and direction, sea height, water temperature and air temperature. According to Captain Brown, buoy data was important, because it gave fishermen a picture of the weather they would encounter offshore. They regarded it as reliable, because it was gathered right on the scene.

Following custom, the masters of the FAIRWIND and SEA FEVER listened to the November 21, 1980 weather forecast issued by the NWS out of Boston at 11:20 a.m. before leaving Hyannis. The Georges Bank forecast indicated good weather for fishing.

10:39 a.m. Friday, November 21, 1980 MARINE FORECAST FOR THE OFFSHORE WATERS EAST OF NEW ENGLAND NORTH OF 40 DEGREES LATITUDE AND WEST OF 60 DEGREES LONGITUDE. COLD FRONT OVER THE GREAT LAKES WILL MOVE ACROSS NEW ENGLAND TONIGHT. A LOW OFF THE SOUTH CAROLINA COAST WILL INTENSIFY AND MOVE NORTHEAST TO A POSITION ABOUT 250 MILES SOUTH OF CAPE SABLE NOVA SCOTIA SATURDAY MORNING.
GULF OF MAINE...
SOUTHWEST WINDS 15 TO 25 KNOTS THIS AFTERNOON SHIFTING TO

THE NORTHWEST TONIGHT. WESTERLY WINDS 15 TO 25 KNOTS ON SATURDAY. SEAS BUILDING TO 4 TO 8 FEET THIS AFTERNOON CONTINUING TONIGHT. GEORGES BANK WEST TO LONGITUDE 72. SOUTHEASTERLY WINDS 15 TO 25 KNOTS THIS AFTERNOON. SHIFTING TO THE NORTHWEST 20 TO 30 KNOTS TONIGHT. WESTERLY WINDS 10 TO 20 KNOTS SATURDAY. SHOWERS THIS EVENING AND TONIGHT WITH VISIBILITY LOCALLY UNDER 1 MILE. SEAS BUILDING TO 5 TO 10 FEET BY TONIGHT.

SOUTH OF NOVA SCOTIA...

A MARINE WARNING MAY BE NEEDED FOR TONIGHT AND SATURDAY...

SOUTHWESTERLY WINDS 15 TO 25 KNOTS THIS AFTERNOON. WINDS SHIFTING TO THE NORTH AT 25 TO 35 KNOTS TONIGHT POSSIBLY HIGHER SATURDAY. SHOWERS OR FLURRIES TONIGHT. OCCASIONAL SNOW NORTH AND RAIN SOUTH SATURDAY WITH VISIBILITY LOCALLY UNDER 1 MILE. SEAS 3 TO 6 FEET TODAY BUILDING TO 6 TO 12 FEET TONIGHT.

Relying on this encouraging forecast, the vessels left port and headed towards the Great Round Shoal Channel which led to open sea. They arrived at the Great Round Shoal buoy at about 5:00 p.m. on November 21st. There, Captain Brown heard the following forecast:

MARINE FORECAST FOR THE OFFSHORE WATERS EAST OF NEW ENGLAND NORTH OF 40 DEGREES LATITUDE AND WEST OF 60 DEGREES LONGITUDE. LOW CENTER ABOUT 125 MILES EAST OF HATTERAS NORTH CAROLINA EARLY THIS AFTERNOON. THE LOW WILL MOVE NORTH-EASTWARD AT ABOUT 30 KNOTS AND INTENSIFY AS IT PASSES ACROSS THE WATERS SOUTH OF NOVA SCOTIA SATURDAY MORNING. A RIDGE OF HIGH PRESSURE MOVING EASTWARD ACROSS NEW ENGLAND PASSING OFF THE COAST SATURDAY EVENING.

GEORGES BANK WEST TO LONGITUDE 72. WINDS SOUTHEASTERLY 10 TO 20 KNOTS SHIFTING TO THE NORTHWEST 20 TO 30 KNOTS OVERNIGHT. NORTHWESTERLY WINDS 15 TO 25 KNOTS SATURDAY SHIFTING TO THE SOUTHWEST SATURDAY NIGHT. RAIN AND FOG LOWERING VISIBILITY TO LESS THAN 1 MILE TONIGHT. SEAS 3 TO 6 FEET TONIGHT AND 5 TO 10 FEET SATURDAY.

After receiving this fair weather forecast, the vessels proceeded to Georges Bank. When they arrived there at approximately 11:00 p.m., the weather began to change for the worse, suddenly and without warning. But, the 10:39 p.m. forecast continued to predict good fishing weather.

10:39 p.m. Friday, November 21, 1980 GEORGES BANK WEST TO LONGITUDE 72. WINDS SOUTHEASTERLY 20 TO 30 KNOTS AND GUSTY SHIFTING TO THE NORTHWEST OVERNIGHT. NORTHWESTERLY WINDS 15 TO 25 KNOTS SATURDAY SHIFTING TO THE SOUTHWEST SATURDAY NIGHT. RAIN AND FOG LOWERING VISIBILITY TO LESS THAN 1 MILE TONIGHT IMPROVING TO OVER 5 MILES SATURDAY. SEAS 5 TO 10 FEET TONIGHT AND SATURDAY.

The first forecast of inclement weather came the next morning, November 22, 1980, at 4:39 a.m. That forecast was as follows:

4:39 a.m. Saturday, November 22, 1980 MARINE FORECAST FOR THE OFFSHORE WATERS EAST OF NEW ENGLAND NORTH OF 40 DEGREES LATITUDE AND WEST OF 60 DEGREES LONGITUDE.

INTENSIFYING GALE CENTER ABOUT 200 MILES SOUTHEAST OF CAPE COD WILL MOVE NORTHEAST PASSING JUST SOUTH OF SABLE ISLAND THIS EVENING AND BEYOND THE OFFSHORE WATERS LATER TO-

NIGHT. HIGH PRESSURE WILL BUILD EASTWARD ACROSS THE WATERS SUNDAY.

GULF OF MAINE...

GALE WARNING IN EFFECT FOR EAST PORTION...

NORTHWEST WINDS 15 TO 25 KNOTS WEST PORTION AND EAST 25 TO 40 KNOTS EAST PORTION SHIFTING TO THE NORTHWEST 30 TO 40 KNOTS THIS MORNING. NORTHWEST WINDS 20 TO 30 KNOTS THIS AFTERNOON EXCEPT UP TO 40 KNOTS EAST PORTION. DIMINISHING WINDS TONIGHT BECOMING SOUTHWEST AROUND 15 KNOTS SUNDAY. RAIN AND FOG WITH VISIBILITIES LOCALLY NEAR ZERO EAST PORTION ENDING LATE TODAY. SEAS 6 TO 12 FEET TODAY SUBSIDING SLOWLY TONIGHT.

After hearing that report, an on duty crewman awakened Captain Brown. Captain Brown's on-site observations were that the winds were already at gale force with heavy rain and seas reaching to 25 feet. Captain Brown decided that any attempt to turn back would be futile, because the intense gale wind was coming from the direction in which the vessel would have headed home. Instead, the vessel headed into the wind, trying to maintain its position and stability.

Later that morning, at 11:20 a.m., a forecast originating from the Boston NWS office, called for winds of 40 to 50 knots and seas 15 to 25 feet.

10:39 a.m. Saturday, November 22, 1980 MARINE FORECAST FOR THE OFFSHORE WATERS EAST OF NEW ENGLAND NORTH OF 40 DEGREES LATITUDE AND WEST OF 60 DEGREES LONGITUDE.

A STORM CENTER ABOUT 200 MILES SOUTH OF HALIFAX NOVA SCOTIA EARLY THIS MORNING WILL MOVE EASTWARD AT 25 KNOTS TO A POSITION ABOUT 150 MILES SOUTH OF SABLE ISLAND EARLY TONIGHT. HIGH PRESSURE WILL BUILD EASTWARD ACROSS THE WATERS SUNDAY.

GULF OF MAINE...

STORM WARNING IN EFFECT AT 10 AM EST...

NORTHWEST WINDS 40 TO 50 KNOTS DIMINISHING TO 20 TO 30 KNOTS OVERNIGHT AND TO WESTERLY AT 15 TO 25 KNOTS SUNDAY. RAIN AND FOG WITH VISIBILITIES MAINLY 1 TO 3 MILES BUT LOCALLY NEAR ZERO—GRADUALLY ENDING FROM WEST TO EAST EARLY TONIGHT SEAS 15 TO 25 FEET REST OF TODAY SUBSIDING SLOWLY TONIGHT.

GEORGES BANK WEST LONGITUDE 72...

STORM WARNING IN EFFECT AT 10 AM EST...

NORTHWEST WINDS 40 TO 50 KNOTS GRADUALLY DIMINISHING TO 20 TO 30 KNOTS OVERNIGHT AND TO WESTERLY AT 20 TO 25 KNOTS SUNDAY. RAIN AND FOG WITH VISIBILITIES 1 TO 3 MILES BUT LOCALLY NEAR ZERO EAST PORTION ENDING BY LATE AFTERNOON. SEAS 15 TO 25 REST OF TODAY SUBSIDING TONIGHT.

Captain Brown's on the spot observation at 11:00 a.m. was that the winds had already reached 70 to 80 knots and that the seas had crested to levels between 30 and 50 feet.

Meanwhile, the FAIRWIND was having comparable problems. It had turned around and was attempting to ride out the storm when it caught a wave and capsized and sank. Crewman Hazard was thrown overboard. After almost a two day struggle on a life raft, Hazard was rescued by the Coast Guard. The other three FAIRWIND crewmen were lost.

The SEA FEVER suffered substantial damage, but did not sink. Tragically, however, crewman Gary Brown was hurled overboard to his death in seas that had reached sixty feet, with winds of approximately 70 knots.

## II

### THE DEFENDANT'S WEATHER DATA BUOY PROGRAM

The National Data Buoy Program is administered by the National Oceanic and Atmospheric Administration (NOAA), an agency of the Department of Commerce. NOAA oversees the placement and operation of buoys that are moored at various points along the United States coastline. The NOAA Data Buoy Center (NDBC) supervises the maintenance and repair performed on the buoys by contractors awarded the job after public bid. The NDBC also contracts with the Coast Guard for ship support necessary to place and service the buoys. The NDBC and the Department of Commerce compile the statistical information that serves as the basis for the buoy maintenance and repair program. For the period April 16, 1980 through March 31, 1981, the maintenance and repair program was awarded to Computer Science Corporation (CSC).

The NDBC monitors the data transmitted by the buoys. It has the responsibility for coordinating a schedule of necessary repairs with CSC and the Coast Guard. The purpose of its monitoring program is to insure prompt maintenance and repair of defective buoys so that incorrect data is not transmitted to the NWS.

Three of the data buoys in the program were located along the Northeast coast. Station 44003 was on Georges Bank. Station 44005 was in the Gulf of Maine. Station 44004, called the Ship Hotel buoy, was located south of the Georges Bank buoy. The information from these buoys was intended to be used by the NWS for offshore forecasts, scheduled daily at 4:39 a.m. and p.m. and at 10:39 a.m. and p.m.

The Ship Hotel buoy had been redeployed in November 1980. The Gulf of Maine

buoy was scheduled to be redeployed in November 1980 after having been off station for about six months. It was not on station, however, during the relevant days of November 1980.

The Georges Bank buoy, on station since March 1977, ceased reporting wind speed and direction in May 1980, a condition that persisted for most of the summer. Its problems were compounded in August 1980, after it was apparently struck by a passing vessel. On station repairs were made to its hull and electronic report system on August 11, 1980, but the entire wind sensor system failed on September 6, 1980. The NDBC knew of this failure but made no further attempts to repair the buoy, nor did the NOAA explore with its contractor the possibility of whether the sensor system could be repaired. No substitute buoy was deployed. The Georges Bank buoy was permitted to remain on station even though it was essentially inoperative. As a result, the NWS suffered a critical void in its information gathering system.[2]

When it functioned properly, the Georges Bank buoy provided forecasters with a reliable hourly electronic "snapshot" of the weather picture within the buoy's immediate vicinity. Weather data measured by the buoy included wind speed and direction.[3] This data is used in conjunction with computer guidance forecasts to predict weather patterns and to track the course of a storm. And so, the buoy not only provides an accurate report of current weather in its vicinity, but also provides the forecaster an hourly report of weather changes, facilitating the issuance of timely storm warnings for inclusion in a forecast or a Notice to Mariners.

Wind speed and direction are the most important factors considered by meteorolo-

---

**2.** The importance of the Georges Bank Buoy is underscored by the observation on April 2, 1980 of Rodney C. Winslow, Acting Meteorologist in charge of the NWS Boston office:

[T]his buoy is extremely important to us in New England. It serves as one of the few reliable observation points in an area where a

tremendous number of fishing vessels operate daily.... (Ex. 17)

**3.** The "snapshot" information transmitted by a properly functioning buoy includes wind speed and direction, sea-level pressure, air temperature, sea surface temperature, and wave height.

gists in formulating and verifying their forecasts. That buoy data is transmitted via satellite to the National Meteorological Center in Washington, D.C. and, within 40 minutes, it is sent on to NWS in Boston.

Forecasters rely on buoy data because it is more accurate than other available surface observations, such as communications from passing ships. Forecasts that are prepared from buoy data, therefore, are particularly crucial to small vessel fishermen when they make a decision as to whether or not it is safe to venture out to sea. Indeed, one reason for the growth of the small vessel lobstering industry during the past several years has been the increased reliability of weather forecasting, thanks to the expanded buoy program, as well as the availability of affordable sophisticated electronic equipment.

The NWS knew of and encouraged small vessel fishermen's reliance on their daily forecasts. Representatives of NWS met with fishermen to encourage daily forecast monitoring. Moreover, buoy location and information were transmitted in the forecasts, indicating an awareness by NWS that such information was of significance to fishermen and would be relied on by them. Small vessel fishermen had faith that the buoy data, and the forecasts based thereon, provided the most accurate and up-to-date "snapshot" of weather conditions at various locations where they intended to fish. Because small vessels are particularly vulnerable to storms, those fishermen regularly monitored relevant forecasts to keep abreast of changing weather en route to a selected fishing ground. Such monitoring enabled the captain to periodically reassess the safety of his venture.

The buoy reports were, at the time of this incident, a critical aspect of the NWS reporting process. In stressing the importance of adequate buoy maintenance, Mr. Winslow observed:

I cannot overemphasize the importance we place on buoy reports ... not only in the daily operational reports ... but also in our important verification program ...

[which] has allowed us to improve forecasts in both the Gulf of Maine and Georges Bank area. TR 2–72.

Notwithstanding Winslow's admonition, and the NWS's awareness of the buoy's importance to a Georges Bank forecast, it was permitted to remain in disrepair for two and one-half months immediately prior to this incident. During that period, the buoy's wind information was so erratic that its transmission was blocked by the NWS. As a consequence, the NWS did not receive any Georges Bank wind information from what had been its most reliable source. Moreover, the NWS never informed the small vessel fishermen that the forecasts upon which they were relying were prepared without this crucial buoy data.

### III

### THE FORECAST

Expert testimony concerning the accuracy of the subject forecast was offered by both the plaintiffs and the defendant. William H. Haggard, a consulting meteorologist, appeared for the plaintiff. The defendant's expert was Frederick Sanders, also a meteorologist. Although the court deemed both witnesses qualified to render opinions on a variety of relevant issues, it found the testimony of Mr. Haggard more persuasive. The court, therefore, accepts and adopts his opinion as to the scenario of relevant events and rejects those of Mr. Sanders that may be in conflict.

Mr. Haggard's opinion was that the NWS did not accurately track the fatal November 21, 1980 storm, because it did not have the Georges Bank buoy data as to wind direction and speed. His opinion was that wind speed and direction, in addition to wave height, constitute the most significant data from a buoy. Of those three elements, he regarded wind speed and direction as the most important for the purposes of analysis and prediction. Wave development may lag four to seven hours behind wind development. Haggard regarded such surface data to be crucial in determining the track of a storm. His

opinion was that if the NWS had received correct wind speed and direction data from the buoy, its forecasters would have realized that their analysis was "impossible [and] ... would have had to relocate the storm to a more proper position, which would have indicated that it was going to go across Georges Bank as it deepened." TR 3–127.

Haggard also opined that, from 7 a.m. on November 21, 1980 up to the point that the vessels and crewmen were in distress, the center of the storm was actually 90 to 150 miles away from where the NWS had placed it. That variance became significant after 7 p.m. on November 21. His conclusion was that, from 7 a.m. on November 21, 1980 to 4 p.m. the next day, the NWS tracking of the storm was significantly incorrect.

Haggard's opinion was that a storm warning should have been issued at 10:39 p.m. on November 21, 1980 and that, if the NWS had the wind speed and direction information from the Georges Bank buoy, a timely forecast could have been issued that would have accurately tracked both the intensity and location of the storm.[4] The court is persuaded by Mr. Haggard's opinions, and therefore, adopts them as findings.

## IV

## DISCUSSION

### A. LIABILITY

■■■ This action was brought under the Suits in Admiralty Act, which provides in pertinent part:

In cases where ... if a private person or property were involved, a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States ....

46 U.S.C. § 742 (1982). Federal law governs maritime tort cases. *See DeBardeleben v. United States,* 451 F.2d 140, 147 (5th Cir.1971). As with all tort actions, plaintiffs bear the burden of showing: (1) that defendant owed them a duty of care; (2) that the duty was breached; and (3) that the breach caused plaintiffs harm. *See Allen v. United States,* 527 F.Supp. 476, 486 (D.Utah 1981).

### 1). Duty

In analyzing the threshold question of whether the NOAA owed plaintiffs a duty of care, the Second Restatement of Torts provides a useful starting point. Section 323 states:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

*Restatement (Second) of Torts* § 323 (1965).

■■■ The legislative history leading to the creation of the NOAA demonstrates clearly that the government intended to undertake and meet the responsibility for providing a reliable weather monitoring and prediction system for the use of commercial fishermen.[5] In hearings before the

---

**4.** Mr. Haggard's expert testimony as to what should have been the proper tracking of the subject storm was based on an analysis called *hindcast* as opposed to the more familiar term, *forecast.* Basically, a hindcast is a reconstruction of weather maps based on an analysis of relevant weather data, weather maps, surface data, Coastal Weather Logs, as well as barometric pressures. The details of Mr. Haggard's analysis, the information he utilized, and the scope of his opinions are set forth fully in the transcript. TR 3–92 to 3–139.

**5.** The NOAA was actually created by a Reorganization Plan prepared by President Nixon. *See* Reorg. Plan No. 4 of 1970, 35 Fed.Reg. 15,627 (1970), *reprinted in* 15 U.S.C.A. § 1511 app. at 715 (West 1982). It is widely accepted that this plan was deeply influenced by the report entitled "Our Nation and the Sea" and the hearings thereon. *See* F. Hoole, R. Friedheim, and T.

House Committee on Merchant Marine and Fisheries,[6] numerous experts stated that one of the NOAA's principal goals was to improve the system of weather monitoring and prediction, thereby making it possible for fishermen to safely venture even further off shore in their quest for a catch. *See, e.g., A Report by the Commission on Marine Science, Engineering and Resources entitled, "Our Nation and the Sea:" Hearings Before the Subcomm. on Oceanography of the House Comm. on Merchant Marine and Fisheries*, 91st Cong., 1st Sess. 13–19 (1969) (testimony of Dr. Julius Stratton) (hereinafter cited as "Hearings").

These Congressional hearings also demonstrate that projects such as the National Data Buoy Development Project[7] were undertaken to improve the accuracy of weather forecasting activities, particularly in areas such as Georges Bank. Dr. Samuel Lawrence stated:

> Most of the weather is made over the water, the west coast weather particularly. [You] ... need to have some capability to observe what is happening in the Pacific to have a forecast capability. I believe the west coast accuracy is below that of other areas of the country because we don't have the capability on the oceans as we have on land. Similarly on the east—Georges Bank and others.

*Id.* at 82.

The NOAA, moreover, was on notice that weather forecasts were important to the safety of commercial fishermen and their vessels. After outlining the goals of the NOAA, including the expansion of commercial fishing, Dr. Julius Stratton, a leading proponent of the establishment of the NOAA, stated,

> The development of a system for monitoring and predicting the state of the oceans and the atmosphere is critical to all that the Nation would do in the Seas.

*Id.* at 16. Obviously, commercial fishermen must have accurate weather information to conduct their activities safely. *Cf. Trade and Transport Inc. v. Caribbean Steamship Inc.*, 384 F.Supp. 782 (S.D.Tex. 1974) (mariner negligent because of failure to monitor NWS forecasts).

The testimony of Captain Brown established that fishermen had come to rely on the government's forecasts. He stated that lobstering in non-coastal waters significantly developed after advances in technology made it possible to monitor NWS forecasts far from shore. Moreover, Captain Brown said that the decision to terminate or continue a particular voyage often hinged on NWS forecasts.

■ Given that defendant undertook to provide a service that was necessary to the protection of plaintiffs, and that plaintiffs relied on that service, this court finds that defendant owed plaintiffs a duty to take reasonable care in maintaining its weather observation and prediction system.

The duty recognized here is a limited one, owed to an identifiable group of mariners that place special reliance on the accuracy of the NWS weather forecast. *De-Bardeleben Marine Corp. v. United States, supra,* is instructive on this point. There, the Fifth Circuit recognized that the United States owed mariners a duty of care in issuing Coast and Geodetic Survey Charts and weekly Notices to Mariners. *Id.* at 149. In limiting its holding, the *DeBardeleben* court stressed two points: (1) the charts in question were distributed to a narrow audience—mariners—through a reliable channel; and (2) the mariners relied on the charts as accurate. *Id.* at 148.

This court's conclusion that the mariners here were owed a duty of due care by the NOAA is supported by decisions of the Supreme Court, the First Circuit, and other district courts. The seminal case on the

---

Hennessey, *Making Ocean Policy: The Politics of Government Organization and Management* 24–25 (1981).

**6.** The hearings were actually before the Subcommittee on Oceanography.

**7.** The project was the predecessor of the National Data Buoy Office.

issue of *duty* is *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). In *Indian Towing*, a tug with a barge in tow ran aground causing cargo damage. Plaintiff there sued the United States, alleging that the Coast Guard negligently failed to maintain a particular lighthouse. On the issue of what duty, if any, the Coast Guard owed the tug, the Supreme Court stated:

> The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a lighthouse on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning.

*Id.* at 69, 76 S.Ct. at 126.[8]

Consistent with the holding in *Indian Towing*, plaintiffs here do not argue that the NOAA had an obligation to provide a weather forecasting system, or that there was a duty to have a data buoy on Georges Bank. Rather, plaintiffs' position is that once the NOAA undertook to provide a forecasting system, and then induced reliance on that system, it was obligated to use due care in seeing to the system's proper maintenance or, at least, to give warning that the system was not functioning correctly.

The First Circuit has consistently followed the teaching of *Indian Towing* in analyzing the issue of whether a duty exists. In *Chute v. United States*, 610 F.2d 7 (1st Cir.1979), *cert. denied*, 446 U.S. 936, 100 S.Ct. 2155, 64 L.Ed.2d 789 (1980), the plaintiff alleged that the buoy selected by the Coast Guard to mark a submerged wreck was inadequate. Although the court rejected the plaintiff's claim on the ground that selection of the type of buoy marker was a matter of governmental discretion,[9] it recognized that:

> The government, just as any private person who undertakes to warn the public of danger and thereby induces reliance, must not worsen the position of those who have come to rely on the service by carelessly omitting it.

*Id.* at 13.

This language applies directly to the instant case. As noted above, plaintiffs here do not challenge the right of the NOAA to select a particular monitoring system. Rather, plaintiffs' complaint is that the NOAA negligently failed to maintain the selected system after fishermen began to rely on it.[10]

Other district courts confronted with this precise issue have recognized a duty on the part of the government. *See e.g., Chanon v. United States*, 350 F.Supp. 1039 (S.D. Tex.1972), *aff'd*, 480 F.2d 1227 (5th Cir. 1973); *Delroy v. United States*, No. 79–546 (S.D.Ind. March 12, 1982). As in the instant case, *Chanon* arose out of the loss of a fishing vessel in a violent storm that the NWS failed to predict. In recognizing that

---

**8.** Recently, the Supreme Court questioned the precedential significance of *Indian Towing* in deciding whether the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a), should be applied to limit government liability. *See United States v. S.A. Empresa de Viacao Aerea Rio Grandense*, — U.S. —, —, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984). Heeding that admonition, this court does not rely on *Indian Towing* in analyzing the discretionary function exception. *See infra* pt. IV(B)(1). The Supreme Court has never questioned the viability of *Indian Towing* as a precedent with respect to the issue of what *duty* may be owed by the government.

**9.** In *Chute* there was no allegation that the buoy selected was negligently maintained.

**10.** *United States v. Sandra & Dennis Fishing Corp.*, 372 F.2d 189, 195 (1st Cir.1967), *cert. denied*, 389 U.S. 836, 88 S.Ct. 48, 19 L.Ed.2d 98 (1967), also is consistent with *Indian Towing* with respect to the duty issue. There, claimants alleged that their boat was lost because Coast Guard rescue vessels were improperly equipped and negligently operated. The First Circuit held that, where no warning had been given, the government had an obligation to assure that the Coast Guard vessel "would perform its functions with reasonable care." 372 F.2d at 195.

the NWS owed mariners a duty of due care, the *Chanon* court stated:

> Since the government, through the Weather Service, had been, for many years, forecasting the weather and issuing reports and warnings for the general public, ... it was under the duty to use due care in gathering weather information, forecasting and making available for broadcasting, up-to-date weather information.

*Chanon,* 350 F.Supp. at 1041 (citations omitted).

In *Chanon,* the court determined that the United States had not breached its duty. The controlling facts in *Chanon* were substantively different from those in this case. Specifically, *Chanon* recognized that "a forecast that turns out to be an erroneous forecast, standing alone, should not be considered as any evidence of fault on the part of the Weather Service." *Id.* at 1041. Here, plaintiffs do not allege that the government was negligent merely because it issued an incorrect forecast. Rather, they argue that defendants were negligent in failing, for more than three months, to make any effort to repair a data buoy whose purpose was to provide information recognized as vital to a reliable forecast— or to even give warning that the critical buoy was essentially out of action.[11] This court agrees.

### 2). Breach

■ Plaintiffs contend that the government breached its duty of due care in deciding not to make any effort to repair the Georges Bank buoy in September merely because the buoy was scheduled to be replaced in January. Plaintiffs argue further that the government's failure to warn mariners that the Georges Bank buoy was not operational exacerbated its negligence. Again, this court agrees.

Under the circumstances here, the conscious decision not to repair the Georges Bank buoy in September merely because it was scheduled to be replaced in January was unreasonable. The buoy information was critical to a reliable forecast. Its data would be unavailable during fall and winter months. Furthermore, the decision by the project manager to replace in January rather than repair in September was made without any inquiry as to how easy or difficult it would be to get the buoy back in action on an interim basis. Indeed, the buoy project manager admitted that he did not make any inquiry of anyone to see if personnel were available to repair the Georges Bank buoy.[12] *Cf. Tringali Brothers v. United States,* 630 F.2d 1089, 1093 (5th Cir.1980) (fourteen day delay in returning navigational buoy to proper location held unreasonable).

Moreover, no attempt was made to notify mariners that the monitoring and prediction system was not functioning properly, particularly those mariners contemplating a venture to the Georges Bank area. It is unnecessary, therefore, to consider whether the government would have met its duty if it had notified mariners of the equipment failure. *Cf. Greer v. United States,* 505 F.2d 90, 92 (5th Cir.1974) (notice of malfunction of navigational aid does not remove government obligation to correct potentially dangerous condition).

### 3). Causation

■ This court is persuaded by the evidence that the defendant's breach of its duty was a "substantial factor" in causing the deaths of fishermen here. *See Gercey v. United States,* 540 F.2d 536, 538 (1st Cir.1976), *cert. denied,* 430 U.S. 954, 97

11. In two other cases brought against the NWS, district courts have held that the plaintiffs were not entitled to recovery. *See Williams v. United States,* 504 F.Supp. 746 (E.D.Mo.1980); *Bartie v. United States,* 216 F.Supp. 10 (W.D.La.1963), *aff'd,* 326 F.2d 754 (5th Cir.1964), *cert. denied,* 379 U.S. 852, 85 S.Ct. 98, 13 L.Ed.2d 55 (1964). These cases are distinguishable from the instant case because they involved attempts to hold the NWS liable for merely issuing an incorrect weather forecast, with no showing of any other negligent act. *See Williams,* 504 F.Supp. at 750; *Bartie,* 216 F.Supp. at 19.

12. TR 6–85.

S.Ct. 1599, 51 L.Ed.2d 804 (1977); W. Prosser, *Handbook of the Law of Torts* 240 (4th ed. 1971). Two areas of evidence are of particular import. The first is the expert testimony of Mr. Haggard[13] that the NWS forecast was significantly incorrect as of 7 a.m. on November 21, 1980, that a storm warning should have been issued no later than 10:39 p.m. that day, and that the lack of buoy data from Georges Bank was critical to the NWS error. The second is the testimony of Captain Brown that if he had received a proper storm warning by 11 p.m. on November 21, 1980 he would have turned around because of the danger, and would have been able to return safely to port. The court considers the testimony of both witnesses to be , credible and persuasive.

*4). Damages*

This was a bifurcated trial dealing solely with the issue of liability. It is not disputed, however, that the seamen in question were killed during the course of the subject storm.

### B. DEFENSES

By way of affirmative defense, defendant argues that this action is barred by the discretionary function and the misrepresentation exceptions to the government's waiver of sovereign immunity in the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* (1982).

*1). Discretionary function*

■ In pertinent part, the discretionary function exception provides that the United States shall not be liable on

> [a]ny claim based upon an act or omission of any employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, .or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee

of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a) (1982).

As a preliminary matter, there is disagreement as to whether the discretionary function exception applies to cases under the Suits in Admiralty Act, 46 U.S.C. § 741 *et seq. Compare Gercey v. United States,* 540 F.2d 536, 539 (1st Cir.1976), *cert. denied,* 430 U.S. 954, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1977) *with DeBardeleben Marine Corp. v. United States,* 451 F.2d 140, 146 (5th Cir.1971). This court, of course, accepts and follows the First Circuit's pronouncement in *Gercey* that the discretionary function exception applies to the Suits in Admiralty Act as well as to the Federal Tort Claims Act. *See* 540 F.2d at 539.

While its exact scope has never been defined, *see Dalehite v. United States,* 346 U.S. 15, 35, 73 S.Ct. 956, 967, 97 L.Ed. 1427 (1953), the Supreme Court recently set forth two factors to be considered in determining whether the government is protected by the discretionary function exception. *See United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* — U.S. —, —, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984). First, a court should consider whether "the Government is acting in its role as a regulator of the conduct of private individuals." *Id.* Second, the court should determine whether the conduct of the government employee—as opposed to his or her status—is of the nature and quality that Congress intended to shield from tort liability. *Id.* In *Varig Airlines,* the plaintiffs alleged that the Federal Aviation Administration negligently failed to inspect certain portions of two aircraft before certifying them for use in commercial aviation. *Id.* at —, 104 S.Ct. at 2765. The Supreme Court concluded that this licensing or certification activity was regulatory in nature. *Id.* at —— ——, 104 S.Ct. at 2767–68. By contrast, defendant in this case was not involved in licensing or certification, but rather in providing a service that, absent government

---

**13.** *Supra* pt. III.

involvement, could have been provided by a private concern.

■ Whether defendant's negligent acts were of the nature and quality that Congress intended to shield from tort liability is a more difficult question, requiring inquiry into the legislative history of the discretionary function exception. *See generally, United States v. Varig Airlines,* —— U.S. at ——, 104 S.Ct. at 2762, *Dalehite v. United States,* 346 U.S. at 24–30, 73 S.Ct. at 962–965. From this legislative history two important principles can be gleaned. First, the discretionary function exception was intended to

> preclude any possibility that the bill might be construed to authorize a suit for damages against the Government growing out of an authorized activity, such as a flood-control or irrigation project, where no negligence on the part of any government agent is shown, and the only ground for suit is the contention that the same conduct by a private individual would be tortious, or that the statute or regulation authorizing the project was invalid.

*Dalehite v. United States,* 346 U.S. at 29 n. 21, 73 S.Ct. at 964 n. 21 (quoting H.R. 2245, 77th Cong., 2d Sess. (1942)). Second, Congress intended to exempt discretionary activities, that is, activities "[w]here there is room for policy judgment...." *Id.* at 36, 73 S.Ct. at 968.

The theory of liability asserted by plaintiffs is not barred by either of these principles. This case is not an attempt to challenge a properly performed, congressionally authorized activity on the theory that similar activity by a private person would be tortious. Plaintiffs, moreover, are not attempting to gain judicial review of an authorizing statute or regulation. They simply assert that defendant induced reliance and then negligently failed to perform.

In addition, the government action here did not involve a policy judgment. The decision to have a weather monitoring and prediction system and the decisions concerning the methods for obtaining observa-

tional data may have involved policy judgments. *See Bartie v. United States,* 216 F.Supp. 10, 19 (W.D.La.1963), *aff'd,* 326 F.2d 754 (1964), *cert. denied,* 379 U.S. 852, 85 S.Ct. 98, 13 L.Ed.2d 55 (1964). Plaintiffs do not challenge those judgments. But, once a system was in place and mariners began to rely on it, the time for policy judgments was past. *See Coastwise Packet Co. v. United States,* 398 F.2d 77, 80 (1st Cir.1968) (discretionary function exception provides almost complete protection to government decisions concerning initiation of a program, but protection decreases after program or policy is established), *cert. denied,* 393 U.S. 937, 89 S.Ct. 300, 21 L.Ed.2d 274 (1968); *Seaboard Coast Line Railroad Co. v. United States,* 473 F.2d 714, 716 (5th Cir.1973) (same).

■ Plaintiffs complaint is that, after inducing reliance on its selected weather system, the government negligently chose not to keep it in repair and failed to issue any warning concerning its disrepair to those relying on it. The law does not permit the government, under the guise of policy making, to negligently remove its proffered safety net without reasonable notice to those who risk their lives daily in reliance on it. For these reasons, the discretionary function defense must be rejected.

*2). Misrepresentation*

Defendant maintains that the plaintiffs' claims are barred by the so-called "misrepresentation" exception to the Federal Tort Claims Act, which states in pertinent part that:

> The provisions of [the Federal Tort Claims Act] shall not apply to ... (h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights....

28 U.S.C. § 2680(h) (1982).

Although the First Circuit has ruled in *Gercey v. United States, supra,* that the "discretionary function" defense under the

Federal Tort Claims Act is applicable to actions under the Suits in Admiralty Act, it has never issued a similar ruling with respect to the "misrepresentation" defense.

In the analogous case of *Ingham v. Eastern Air Lines*, 373 F.2d 227 (2d Cir. 1967), *cert. denied*, 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1967), a federal aircraft controller failed to alert an incoming aircraft that visibility had been reduced from one mile to three quarters of a mile as a result of a change in weather. The aircraft crashed and the government was found liable under the Federal Tort Claims Act. On appeal, the government asserted the misrepresentation defense on the ground that the controller's failure to alert the aircraft to the change in visibility was a misrepresentation. In rejecting this defense, the Second Circuit stated:

> [T]he government's reading of the misrepresentation exception is much too broad, for it would exempt from tort liability any operational malfunction by the government that involved communications in any form.... Where the gravamen of the complaint is the negligent performance of operational tasks, rather than misrepresentation, the government may not rely upon § 2680(h) to absolve itself of liability.

*Id.* at 239.

In this case, the inaccurate forecast was the consequence of the government's negligent performance of the operational task it had assumed of compiling data on the weather at sea from offshore buoys. Since the government's negligence in performing this operational task is the basis of the

plaintiff's complaint, the government cannot rely on the misrepresentation defense.

 The Supreme Court's recent decision in *Block v. Neal*, 460 U.S. 289, 103 S.Ct. 1089, 75 L.Ed.2d 67 (1983), is also instructive as to the inapplicability of the misrepresentation defense in this case. In *Neal*, the plaintiff claimed that the Farmers Home Administration ("FmHA") had failed to use due care in supervising the construction of her house, and had led her to believe that the house was properly constructed when in fact it was not. In rejecting the government's misrepresentation defense, the Court stated: "Section 2680(h) thus relieves the Government of tort liability for pecuniary injuries which are wholly attributable to the Government's negligent misstatements." [14] *Id.* at 297, 103 S.Ct. at 1093. In *Neal*, the plaintiff's injuries were not only attributable to the FmHA's misrepresentation as to the quality of the construction, but also to the FmHA's negligent supervision of the construction. In this case, the plaintiffs' claim is not based on the inaccurate weather forecasts but rather on the cause of their inaccuracy—the government's negligent failure to maintain the Georges Bank buoy.

## CONCLUSION

For the reasons set forth in this opinion, a judgment is entered for the plaintiffs on the issue of liability. A pre-trial conference on the issue of damages will be held on January 28, 1985 at 10 a.m.

It is so ORDERED.

> As Dean Prosser has observed, many familiar forms of negligent conduct may be said to involve an element of "misrepresentation," in the generic sense of that word, but "[s]o far as misrepresentation has been treated as giving rise in and of itself to a distinct cause of action in tort, it has been identified with the common law action of deceit," and has been confined "very largely to the invasion of interests of a financial or commercial character, in the course of business dealings."
> *Id.* at 711 n. 26, 81 S.Ct. at 1302 n. 26.

**14.** The fact that the plaintiffs in this case seek compensation for personal as opposed to pecuniary injuries does not detract from this statement's applicability. To the contrary, the misrepresentation defense is more appropriate in cases involving pecuniary injuries than those involving other types of injuries. In *United States v. Neustadt*, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961), a case involving pecuniary injuries, the Court held that the government was protected by the misrepresentation defense. The *Neustadt* Court distinguished *Indian Towing, supra,* a case involving property damage, on the ground that there was no misrepresentation in *Indian Towing.* In so doing, the Court stated: